STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FRANK LEONARDIS, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. STEPHEN ROSE, DEFENDANT-APPELLANT, AND MICHAEL BATTAGLIA AND DALE BATTAGLIA, DEFENDANTS.

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. FREDRICK JOHN STRYCHNEWICZ, DEFENDANT-RESPONDENT.

Reargued November 8, 1976—Decided May 31, 1977.

*Mr. Robert J. Del Tufo,* Director, Division of Criminal Justice, argued the cause for amicus curiae Attorney General (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney *pro se; Mr. Lowell Espey, Mr. David S. Baime* and *Mr. John De Cicco,* of counsel and on the brief).

*Mr. Richard J. Williams* argued the cause for *amicus curiae* County Prosecutors' Association of New Jersey.

*Mr. William Z. Shulman,* Assistant Prosecutor, argued the cause for the State of New Jersey (*Mr. James T. O'Halloran,* Hudson County Prosecutor, attorney).

*Mr. David A. Pressler* argued the cause for *amicus curiae* Bergen County Bar Association (*Mr. Michael J. Breslin,* on the brief).

*Mr. Ezra D. Rosenberg,* Assistant Deputy Public Defender, argued the cause for defendant Leonardis and for *amicus curiae* Public Defender in *Strychnewicz* (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Gary H. Schlyen* and *Mr. Joseph J. Rodgers* submitted a brief on behalf of intervenor Passaic County Prosecutor

(*Mr. Burl Ives Humphreys,* Passaic County Prosecutor, attorney *pro se*).

*Mr. Ervan F. Kushner* submitted a brief as *amicus curiae*.

The opinion of the court was delivered by

PASHMAN, J. In *State v. Leonardis,* 71 *N. J.* 85 (1976) (hereinafter *"Leonardis"*), this Court considered the validity of pretrial intervention programs adopted by Bergen and Hudson Counties pursuant to *R.* 3:28.[1] In that opinion we fully outlined the history of pretrial intervention (PTI) and the policy considerations which led to the adoption of *R.* 3:28. Using the context of the specific cases before us, we augmented the procedures mandated by the rule, holding that a prosecutor who refuses to divert a defendant into PTI must furnish a record of the reasons for his decision. 71 *N. J.* at 114. Equally important, we required PTI programs to be implemented according to formal, uniform guidelines, 71 *N. J.* at 97–98, 121, and instituted procedures for judicial review to assess both the overall operation of the Court-implemented program and individual decisions made pursuant to these procedures. 71 *N. J.* at 109.

---

[1] *Rule* 3:28 provides in pertinent part:

*Pretrial Intervention Programs*

(a) In counties where a pretrial intervention program is approved by the Supreme Court for operation under this rule, the Assignment Judge shall designate a judge or judges to act on all matters pertaining to the program, with the exception, however, that the Assignment Judge shall himself or herself act on all such matters involving treason, murder, kidnapping, manslaughter, sodomy, rape, armed robbery, or sale or dispensing of narcotic drugs by persons not drug-dependent.

(b) Where a defendant charged with a penal or criminal offense has been accepted by the program, the designated judge may, on the recommendation of the Trial Court Administrator for the county, the Chief Probation Officer for the county, or such other person approved by the Supreme Court as program director, and with the consent of the prosecuting attorney and the defendant, postpone all further proceedings against said defendant on such charges for a period not to exceed 3 months.

The appeals in that case were brought by three individuals, Frank Leonardis, Stephen Rose and Frederick Strychnewicz. All three had been accused of drug-related offenses and had been denied admission into PTI. Leonardis and Rose sought admission into the Bergen County program. Leonardis had been charged with possession of a controlled dangerous substance (marijuana), in violation of *N. J. S. A.* 24:21–19(a)(1), and Rose had been charged with the same offense and with conspiracy to possess and distribute a controlled dangerous substance in violation of *N. J. S. A.* 24:21–24. We held that by precluding from consideration for PTI all defendants charged with "heinous offenses," among which was the sale of a controlled dangerous substance, the Bergen County criteria for admission into PTI failed to conform to the rehabilitative purposes of *R.* 3:28. 71 *N. J.* at 112. Accordingly, we reversed the Appellate Division and remanded the appeals to the trial court to determine whether diversion would be appropriate in light of our opinion. 71 *N. J.* at 113.

Strychnewicz had been denied admission into the Hudson County program. He had been charged with possession of and possession with intent to distribute hashish, a controlled dangerous substance, in violation of *N. J. S. A.* 24:21–20(a) and 24:21–19(a). We affirmed the trial court's grant of his motion for an order compelling the prosecutor to give reasons for refusing to consent to PTI, and remanded for proceedings in accordance with our opinion.[2] 71 *N. J.* at 119

Following our decision in *Leonardis,* the Attorney General filed notices of motions to intervene as *amicus curiae,* to obtain an extension of time in which to file a petition for clarification and for a stay of judgment. On September 8, 1976, we granted the motion for clarification and rehearing

---

[2]Although of no legal significance to the arguments in this case, none of the three defendants was admitted to PTI upon remand. Rose was tried on the charges and acquitted on January 13, 1977; Leonardis is scheduled for trial on June 6, 1977; and Strychnewicz pleaded guilty to the charges.

to consider the Court's authority to order diversion of a defendant into PTI when the prosecutor refuses to consent to diversion. We directed the parties to consider whether, in light of the doctrine of separation of powers, the Court had the power, either before or after indictment, to divert a defendant over the prosecutor's objection pursuant to either its rule-making or adjudicatory power. On the same day, September 8, 1976, we entered an order adopting guidelines governing the operation of PTI programs. 99 *N. J. L.* at 865 (September 30, 1976).

In addition to the briefs submitted by the Hudson County Prosecutor, the Public Advocate and the Attorney General, the Court entertained *amicus curiae* briefs from the Trustees of the Bergen County Bar Association and Judge Ervan Kushner, Presiding Judge of the Municipal Court of Paterson. We granted the Passaic County Prosecutor's motion to rely upon the brief he filed in *Leonardis.*

I

## *CONSTITUTIONALITY OF R. 3:28*

### A. *Pretrial Intervention as a Court Rule*

Although rehearing was limited to the issue of the Court's power to divert a defendant when the prosecutor refuses to consent to diversion, the answer to this question rests, in large part, upon the scope of our constitutionally authorized rule-making, Art. VI, § II, par. 3, and judicial powers, Art. VI, § I, par. 1.

Pretrial intervention was adopted in this state pursuant to Court rule. The Court's power to promulgate rules stems from the constitutional grant of such authority in *N. J. Const.* (1947) Art. VI, § II, par. 3, which states in pertinent part:

The Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts.

The rule-making authority has also been widely recognized as falling within courts' inherent powers. See Joiner & Miller, "Rules of Practice and Procedure: A Study of Judicial Rule-Making, 55 *Mich. L. Rev.* 623, 624 (1957); Pound, "Procedure Under Rules of Court in New Jersey," 66 *Harv. L. Rev.* 28, 37 (1952); *Vanderbilt, Minimum Standards of Judicial Administration* 132 (1949); Wigmore, "All Legislative Rules for Judiciary Procedure are Void Constitutionally," 23 *Ill. L. Rev.* 276, 278 (1928).

In *Leonardis* we held that PTI was "a procedural alternative to the traditional system of prosecuting and incarcerating criminal suspects," 71 *N. J.* at 92, and thus within the practice and procedure over which our rule-making power extends. Apart from the rule's goal of aiding in the early rehabilitation of offenders, we also noted that it solved many of the procedural problems facing our judicial system. We cited one author for the proposition that

diversion serves to dispose quickly and inexpensively of cases which are more effectively handled without full criminal disposition. This permits the court to focus its attention and concentrate its resources on those cases where deterrence and rehabilitation can best be achieved by ordinary criminal processing. [Note, "Addict Diversion: An Alternative Approach for the Criminal System," 60 *Geo. L. J.* 667, 673 (1972)]

[71 *N. J.* at 96.]

We added that

pretrial intervention provides one means of addressing the problems of congestion and backlog of cases which currently confront our prosecutors, public defenders and courts. To the extent that a PTI program averts the costs of processing these cases, it also permits a more efficient use of the limited resources available to law enforcement authorities.

[*Id.* at 97.]

As a procedural alternative to trial, PTI falls within the practice and procedure over which the Court has control through its rule-making powers.

## B. *Separation of Powers*

 Concerns over the constitutionality of PTI under the separation of powers[4] doctrine stem most directly from the second goal of that program — aiding in the early rehabilitation of offenders. While we did not expressly address ourselves to this issue in *Leonardis,* we are of the opinion that *R.* 3:28 does not encroach upon the powers delegated to the legislative or executive branches of government. This conclusion is based both on the nature of the separation of powers doctrine and on the judicial power vested in the Supreme Court.

 We have previously adverted to the constitutional procedural power vested in the Supreme Court. Coupled with that is "[t]he judicial power" entrusted to the Court. *N. J. Const.* (1947) Art. VI, § I, par. 1. Inherent in that judicial power is the judiciary's authority to fashion remedies once its jurisdiction is invoked.[5] See *Adams v. McCorkle,* 13 *N. J.* 561, 564 (1953). This is not to say that the Court can deprive the Legislature of its right to determine that certain types of conduct constitute substantive crimes. *State v. Naglee,* 44 *N. J.* 209, 226 (1965); *State v. Holroyd,* 44 *N. J.* 259, 265 (1965). But we have held that: "[t]he fact that the Legislature has acted to provide a remedy does

---

[4]*N. J. Const.* (1947) Art. III, par. 1 provides:
1. Branches of government
1. The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.

[5]For instance, it has been repeatedly stated that sentencing is a judicial function. *See e. g., State v. Spinks,* 66 *N. J.* 568 (1975); *Clifford v. Heller,* 63 *N. J. L.* 105 (Sup. Ct. 1899); *Jackson v. United States,* 338 *F. Supp.* 7 (D. N. J. 1971), *cert.* den. 406 *U. S.* 947, 92 *S. Ct.* 2050, 32 *L. Ed.* 2d 334 (1972); *People v. Tenorio,* 3 *Cal.* 3d 89, 89 *Cal. Rptr.* 249, 473 P. 2d 993 (1970).

not mean that the judicial branch is limited to the boundary lines of strict legislative expression in fashioning or denying remedies in a particular case." *State v. Carter,* 64 *N. J.* 382, 392 (1974). In *State v. Carter* we made it clear that:

The court's power to fashion remedies in the realm of criminal justice is unquestioned. At common law, courts of criminal jurisdiction had the power to suspend sentences. *In re Baer,* 140 *N. J. Eq.* 571, 573 (E. & A. 1947). Probation has a deep-rooted common law basis. The enactment of a statute relating to a particular aspect of probation does not preempt the entire field. *Lathrop v. Lathrop,* 57 *N. J. Super.* 532, 538–539 (App. Div. 1959). It follows that a statute neglecting to mention probation would certainly not preempt the court's ability to provide for it.

[*Id.*]

We view PTI as a remedial aspect of a criminal proceeding. ▮ It is important to note that the separation of powers doctrine does not require an *absolute* division of powers among the three branches of government, or as Chief Justice Vanderbilt stated, "division of government into three . . . watertight compartments." Vanderbilt, *The Doctrine of Separation of Powers and Its Present-Day Significance* 50 (1953). *See also, In Re Investigation Regarding Ringwood Fact Finding Commission,* 65 *N. J.* 512, 519 (1974); *David v. Vesta Co.,* 45 *N. J.* 301, 324 (1965); *Massett Building Co. v. Bennett,* 4 *N. J.* 53, 57 (1950); *Robinson v. Cahill,* 67 *N. J.* 333, 377 (1975)(Mountain, Clifford, JJ., dissenting), *cert.* den. sub nom., *Klein v. Robinson,* 423 *U. S.* 913, 96 *S. Ct.* 217, 46 *L. Ed.* 2d 141 (1975). The aim of the constitutional provision is not to prevent cooperative action among the three branches of government, but to guarantee a system of checks and balances. This notion of a blending of powers is expressed in various opinions by both this Court and the United States Supreme Court, interpreting the State and Federal Constitutions. In *Brown v. Heymann,* 62 *N. J.* 1 (1972), Chief Justice Weintraub explained:

It is well to repeat that while the doctrine of separation of powers is designed to prevent a single branch from claiming or receiving inordinate power, there is no bar to cooperative action among the branches of government. On the contrary, the doctrine necessarily assumes the branches will coordinate to the end that government will fulfill its mission.

[62 *N. J.* at 11]

This same theme — approving cooperative effort among the three branches of government — was expressed by Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 *U. S.* 579, 72 *S. Ct.* 863, 96 *L. Ed.* 1153 (1952): "[w]here the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." 343 *U. S.* at 635, 72 *S. Ct.* at 870, 96 *L. Ed.* at 1199 (Jackson, J., concurring). And Judge Gibbons of the Third Circuit recently described the doctrine as calling for "[a] dispersal of decisional responsibility in the exercise of each power, as distinguished from a separation of powers. . . ." Gibbons, "The Interdependence of Legitimacy," 5 *Seton Hall L. Rev.* 435, 436 (1974). *See also, Davis, Administrative Law Treatise* § 1.09 at 68 (1958) ("The danger is not blended power. The danger is unchecked power.").

The applicability of the doctrine of separation of powers to the Court's rule-making powers has been discussed by both Chief Justice Vanderbilt and Dean Roscoe Pound. Writing for the Court in *Winberry v. Salisbury*, 5 *N. J.* 240 (1950), *cert.* den. 340 *U. S.* 877, 71 *S. Ct.* 123, 95 *L. Ed.* 638 (1950), the Chief Justice noted that the separation of powers did not prevent the Court from exercising the full sweep of its rule-making powers. He concluded that some overlapping of functions is necessary if the Government is to perform effectively, and denied that the separation of powers doctrine curtailed the Court in its rule-making function. He stated that "[w]hatever confusion there may be as to the nature of the rule-making power stems from an oversimplification of the doctrine of separation of powers." 5 *N. J.* at 251. Dean Pound reiterated this

thought when he commented upon the *Winberry* decision, stating that "[a] mistaken extreme analytical idea of the separation of powers long stood in the way of leaving procedure to rules of court and persists in the attacks upon the decision in *Winberry v. Salisbury."* Pound, "Procedure Under Rules of Court in New Jersey," *supra,* 66 *Harv. L. Rev.* at 33. *See also, Sutherland Statutory Construction* § 3.27 (3 ed. rev. 1972). Accordingly, the separation of powers doctrine should not be construed to prevent the Court from adopting rules which have some effect on matters which involve executive and legislative functions.

 Pretrial intervention presents precisely the type of cooperative action which the foregoing cases have approved. While PTI serves certain rehabilitative goals which may fall also within the legislative realm, it hardly can be said to impair the "essential integrity of one of the great branches of government." *Massett Building Co. v. Bennett, supra,* 4 *N. J.* at 57. In fact, the program is specifically tailored to respect the Legislature's judgment. Guideline 3(i) requires authorities in charge of diversion to pay deference to the legislative decision involved in evaluating the seriousness of a given act. By instructing the program director and the prosecutor to consider the nature of the offense, the guidelines follow the Legislature's lead in determining, generally, whether a class of offenders should be diverted into PTI. In addition, Guideline 3(h) specifically requires the court, the program director and the prosecutor to consider the eligibility criteria and guidelines for exclusion enacted by the Legislature where the defendant is being considered for pretrial intervention pursuant to the Controlled Dangerous Substances Act, *N. J. S. A.* 24:21–27.

While we recognize that PTI may have an impact upon the substantive rights and liabilities of a defendant, this fact alone is not enough to warrant a different outcome. In *Busik v. Levine,* 63 *N. J.* 351 (1973), Chief Justice Weintraub, writing for a plurality of the Court, underlined the

difficulties in defining the distinction between procedure and substance. He emphasized that

> [i]t is simplistic to assume that all law is divided neatly between "substance" and "procedure." A rule of procedure may have an impact upon the substantive result and be no less a rule of procedure on that account.
>
> [63 *N. J.* at 364.][5]

Noting that rules governing prejudgment interest, statutes of limitations and evidence all have an impact upon the substantive rights and liabilities of the parties, he explained that they were nevertheless appropriate subjects of the Court's rule-making function. 63 *N. J.* at 366 *et seq.* Other courts and commentators have reached the same conclusion. In *Hanna v. Plumer*, 380 *U. S.* 460, 85 *S. Ct.* 1136, 14 *L. Ed.* 2d 8 (1965), the Court was faced with construing the scope of the federal rule-making power. The federal statute, as does our state constitutional provision, conferred power upon the Court to promulgate rules governing practice and procedure, as long as they did not "abridge, enlarge or modify any substantive right." 28 *U. S. C.* § 2072 (1958 ed). The Court commented that "(t)he line between 'substance' and 'procedure' shifts as the legal context changes. 'Each implies different variables depending upon the particular problem for which it is used.' [*Guaranty Trust Co. v. York*, 326 *U. S.* 99, 108, 65 *S. Ct.* 1464, 1469, 89 *L. Ed.* 2079, 2085 (1945)]." 380 *U. S.* at 471, 85 *S. Ct.* at 1144, 14 *L. Ed.* 2d at 16. *See also, Cohen v. Beneficial Industrial Loan Corp.*, 337 *U. S.* 541, 559, 69 *S. Ct.* 1221, 1231, 93 *L. Ed.* 1528, 1543 (1949) (Rutledge, J., dissenting)

---

[5]A majority of the Court evidently felt that a rule could embody both procedural and substantive aspects. Mr. Justice Hall, in an opinion joined by Mr. Justice Sullivan, concluded that prejudgment interest was "one of those gray areas, like rules of evidence, which has both procedural and substantive aspects, . . . [but that it] . . . has sufficient procedural aspects justifying the court's adoption of it. . . ." [63 *N. J.* at 374].

("actually in many situations procedure and substance are so interwoven that rational separation becomes well-nigh impossible.") ; Levin & Amsterdam, "Legislative Control over Judicial Rule-Making; A Problem in Constitutional Revision," 107 *U. Pa. L. Rev.* 1, 14–15 (1958).

▮ ▮ Thus, we conclude that an absolute prohibition against rules which merely affect substantive rights or liabilities, however slight such effect may be, would seriously cripple the authority and concomitant responsibility which have been given to the Court by the Constitution. *See Fehrenbach v. Fehrenbach,* 42 *Wis.* 2d 410, 167 *N. W.* 2d 218 (1969) (statutory grant of rule-making power not violated by rule which has substantive effect of extinguishing a right or cause of action or creating a defense). However, this should not be taken as a departure from the long standing rule that the Court is not to invade the Legislature's domain by "mak[ing] substantive law wholesale through the exercise of the rule-making power." *Winberry v. Salisbury, supra,* 5 *N. J.* at 248. *See also, George Siegler Co. v. Norton,* 8 *N. J.* 374 (1952). Nor is this to be taken as an indication of the Court's authority to upset existing legislative enactments which are substantive in scope. While we have interpreted Art. VI, § II, par. 3 to give the Court exclusive and plenary power over rules which are procedural in nature, *Winberry v. Salisbury, supra, George Siegler Co. v. Norton, supra,* nothing which we have said today should foreclose the Legislature from enacting measures affecting the substantive aspects of PTI.[6] It is not our desire to

---

[6]Equally important, we should not expect that either the Judiciary or the Legislature will engage in a test of the limits of their power. As Chief Justice Weintraub noted in *Busik v. Levine*:

A coordinate branch should not invite a test of strength by proclamation. Our form of government works best when all branches avoid staking out the boundaries which separate their powers. [63 *N. J.* at 373]

Significantly, adoption of PTI pursuant to a court rule has not engendered a conflict with the Legislature. Although the Legislature

inhibit legislative action in this sphere; on the contrary, we welcome it.

## II

## CONSTITUTIONALITY OF JUDICIAL REVIEW OVER PTI

A. *The Rule-making Power*

██ ██ The constitutionality of the enabling court rule provides the essential foundation for mandating judicial review of determinations made pursuant to that rule. As we stated in *Leonardis,* authority to engage in rule-making also includes the power to interpret and enforce court rules. 71 *N. J.* at 108–09. *See also, State v. Rush,* 46 *N. J.* 399 (1966); *In re Mattera,* 34 *N. J.* 259 (1961); *John S. Westervelt's Sons v. Regency, Inc.,* 3 *N. J.* 472 (1950). We therefore reaffirm our holding in *Leonardis* that

our powers of enforcement under . . . [*N. J. Const.* (1947) Art. **VI,** § II, par. 3] also include the power to review the operation of court initiated procedures and to review the legal determinations made pursuant to these procedures. Our failure to do so would be an abdication of the rule-making authority with which we have been entrusted.

[71 *N. J.* at 109]

Unless we are to adopt an interpretation which would render our enforcement powers under Art. VI, § II, par. 3 meaningless, our rule-making power must be held to include the power to order the diversion of a defendant into PTI where either the prosecutor or the program director arbitrarily fails to follow the guidelines in refusing to consent to diversion. Conversely, where the program director or the prosecutor would subvert the goals of the program by approving diversion, meaningful judicial review must also be cognizable.

has enacted measures dealing with an intervention program for narcotics offenders, *N. J. S. A.* 24:21–27, there is no general enactment dealing with pretrial intervention.

██ We also noted in *Leonardis* that the decision to di-
vert a defendant into PTI is functionally a quasi-judicial
decision. *Also see, infra* at 378–380. As our opinion there
suggests, this conclusion dissolves any argument that by or-
dering a defendant into PTI a court would be violating the
separation of powers doctrine:

> Our recognition that the decision to admit or reject an applicant
> for pretrial intervention is an exercise of quasi-judicial power obvi-
> ates our need to discuss the analogies that the parties draw between
> PTI programs and administrative agencies. *Within a wholly judicial
> sphere we are not confronted by potential conflicts with either the
> executive or the legislative branches of our government;* similarly,
> we are not faced with the need to defer to the expertise of an ad-
> ministrative body.
>
> [71 *N. J.* at 115–16.]

### B. *Adjudicatory Power*

We are also satisfied that courts have ample authority
under their adjudicatory powers to review prosecutorial de-
cisions where there is a showing of patent and gross abuse.
· Even if a diversion decision did not entail the exercise
of a "quasi-judicial power," review in this instance would
be consistent with the traditional role which courts have
exercised in safeguarding individuals from abusive govern-
mental action. The judiciary is commonly called upon to
review the rationality of decisions by other branches of
government or agencies with special expertise. For instance,
in *State v. Wingler,* 25 *N. J.* 161 (1975), this Court up-
held its power to review action by the Commissioner of
Institutions and Agencies, even though it noted that the
authority vested in him was "highly discretionary and that
courts will not ordinarily interfere with its exercise," 25
*N. J.* at 180–81. *In re Senior Appeals Examiners,* 60 *N. J.*
356 (1972) furnishes another example where the Court as-
serted its power to review decisions which, in the first in-
stance, were not judicial in nature. We concluded that the
authority delegated to the Civil Service Commission "carried
with it the administrative responsibility of acting reason-

ably both procedurally and substantively" and that judicial review was appropriate to determine if the Commission had abused its discretion. 60 *N. J.* at 370. In discussing our power to review decisions of the Parole Board, we held in *Monks v. N. J. State Parole Board,* 58 *N. J.* 238 (1971) that the Board "has broad but not unlimited discretionary powers * * * and under our special constitutional structure (*N. J. Const.,* Art. VI, sec. 5, para. 4 (1947)) the Board's actions are always judicially reviewable for arbitrariness."[7] 58 *N. J.* at 242. We implicitly recognized this aspect of the Judiciary's review power in *Leonardis* when we voiced our desire to limit "a decisional process which might yield *ad hoc* or arbitrary determinations." 71 *N. J.* at 121.

Certainly, the prosecutor is not immune from the ban against arbitrariness in governmental decision-making. In *In re Investigation Regarding Ringwood Fact Finding Comm., supra,* the Court held that it had authority to review the prosecutor's decision to dismiss a complaint concerning an election law violation. It rejected all assertions that such review would violate the separation of power doctrine, 65 *N. J.* at 518, stating:

---

[7] *N. J. Const.* (1947), Art. VI, § V, par. 4 confers prerogative writ jurisdiction on the Judiciary. This authority has been broadly construed to give the court system review power over administrative action, inferior governmental tribunals, and "other public officers." *Monks v. N. J. State Parole Board, supra,* 58 *N. J.* at 242. It is universally recognized that, as an aspect of the courts' duty to ensure fundamental fairness, they will root out arbitrary governmental action. For instance, in *Hyman v. Muller,* 1 *N. J.* 124 (1948), the Court described this role under the Due Process Clause of the Fourteenth Amendment as "shield[ing] the litigant against arbitrary action in disregard of essential right and justice." 1 *N. J.* at 129. In *Wolff v. McDonnell,* 418 *U. S.* 539, 94 *S. Ct.* 2963, 41 *L. Ed.* 2d 935 (1974) the Court stated: "[T]he touchstone of due process is protection of the individual against arbitrary action of government." [418 *U. S.* at 558, 94 *S. Ct.* at 2976, 41 *L. Ed.* 2d at 952.] Our duty to guarantee equal protection and due process under Art. 1, ¶ 1 of our State Constitution requires no less.

It would indeed disserve our democratic processes if misconceptions with respect to the proper meaning and scope of the doctrine of separation of powers were to result in retrogressive restrictions on this and comparable judicial controls which are so well-designed towards curbing governmental improprieties and excesses.

[65 *N. J.* at 520][8]

Even assuming *arguendo* that the prosecutor is entitled to the full protection which the Executive enjoys under the separation of powers doctrine, this fact alone would not render him beyond the reach of judicial review. *United States v. Nixon,* 418 *U. S.* 683, 94 *S. Ct.* 3090, 41 *L. Ed.* 2d 1039 (1974); *United States v. United States District Court,* 407 *U. S.* 297, 92 *S. Ct.* 2125, 32 *L. Ed.* 2d 752 (1972).

Nor can we conclude that by overruling a decision by a prosecutor, a judge would be exercising a prosecutorial function. As we stated in *Leonardis,* the decision to admit or

---

[8]It has been asserted that the defendant who is denied diversion will suffer no grievous loss of liberty, but would merely be subject to the same trial process which he would have undergone if PTI had not been adopted. This argument misses the point. Once the government undertakes to act, it is obligated under our Constitution not to do so in an arbitrary or capricious manner. For instance, in *Griffin v. Illinois,* 351 *U. S.* 12, 76 *S. Ct.* 585, 100 *L. Ed.* 891 (1956), *reh.* denied 351 *U. S.* 958, 76 *S. Ct.* 844, 100 *L. Ed.* 1480 (1956), the Court held that even though a state was not obligated to provide an appeal, once it did so it could not engage in invidious discrimination. Similarly, though the Legislature is not obligated to pass a particular piece of legislation, once it acts it is bound by the constitutional proscription against arbitrariness. *Cf., Nebbia v. New York,* 291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L. Ed.* 940 (1934); *State v. Krol,* 68 *N. J.* 236 (1975). Professor Davis explains that the injury is not that the prosecutor refuses to act leniently, but that he exercises his discretion in an arbitrary manner:

*The discretionary power to be lenient is an impossibility without a concomitant discretionary power not to be lenient, and injustice from the discretionary power not to be lenient is especially frequent; the power to be lenient is the power to discriminate.*

[Davis, *Discretionary Justice* 170 (1969); emphasis in original; footnote omitted.]

reject an applicant into a PTI program "is an exercise of quasi-judicial power." *See ante* 71 *N. J.* at 115. Certainly PTI involves alternatives for a prosecutor which he would not have had absent *R.* 3:28. As the ABA Commission on Correctional Facilities and Services concludes, PTI involves far more than merely an exercise of the charging function. The report states:

It is one thing not to charge and let the accused go totally free, but it may be quite another to withhold a charge, and hence not to invoke the jurisdiction of the court system, on condition that an uncharged, untried, unconvicted person submit to a correctional program.

[*Pretrial Intervention Legal Issues*: *A Guide to Policy Development* 12, n. 4 (1974)]

*See Gerstein v. Pugh,* 420 *U. S.* 103, 114, 95 *S. Ct.* 854, 43 *L. Ed.* 2d 54 (1975) (suggesting in dicta that where pretrial release is attended by "burdensome conditions" a judicial hearing may be necessary). Not only would this result give prosecutors more control than they had prior to the adoption of PTI, but it would pose the threat of expanding governmental control over individuals suspected, yet not convicted, of committing crimes. See Note, "Diversion: The Threat of Expanding Social Control," 10 *Harv. Civ. Rights-Civ. Lib. L. Rev.* 180, 182, 197 (1975) ;[9] Note, "Pretrial Intervention Programs-An Innovative Reform of the Criminal Justice System," 28 *Rutgers L. Rev.* 1203,

---

[9] This Note also points out that by formalizing pre-existing discretionary practices, PTI gives "official definition to these practices and enlarges their scope . . ." 10 *Harv. Civ. Rights-Civ. Lib. L. Rev.* at 184. In Note, "Pretrial Diversion from the Criminal Process," *supra*, it is stated: "most pretrial diversion cases, given the nonserious nature of the charges, would have been disposed of by negotiation and plea rather than trial on the merits." 83 *Yale L. J.* at 835. Thus, it also supports the thesis that PTI, if left to the unbridled discretion of prosecutors, might expand the scope of the criminal justice system.

1223 (1975); Note, "Pretrial Diversion from the Criminal Process," 83 *Yale L. J.* 827 (1974).

 Other courts have also concluded that diversion entails more than merely the charging function, and hence, cannot be said to fall solely within the discretion of the prosecutor. The California Supreme Court, for instance, held that diversion under California's statutory pretrial program was essentially a judicial function. *People v. Superior Court of San Mateo County,* 11 *Cal.* 3d 59, 113 *Cal. Rptr.* 21, 520 *P.* 2d 405 (1974); *Sledge v. Superior Court of San Diego,* 11 *Cal.* 3d 70, 113 *Cal. Rptr.* 28, 520 *P.* 2d 412 (1974). In the former case the court expressly rejected the notion that diversion was an aspect of the prosecutor's charging function, and instead, held that "[a]t whatever stage such intervention occurs . . . it is an integral step in the process leading to the disposition of the case before the court, and therefore constitutes an exercise of judicial authority within the meaning of the constitutional doctrine of separation of powers." 11 Cal. 3d at 68, 113 *Cal. Rptr.* at 27, 510 *P.* 2d at 409. It reasoned that once the question of diversion arises

the prosecutorial die has long since been cast. The case is "before the court" for disposition, and disposition is a function of the judicial power no matter what the outcome.

[11 *Cal.* 3d at 65,

113 *Cal. Rptr.* at 26, 520 P. 2d at 410][10]

*See also, United States v. Gillespie,* 345 *F. Supp.* 1236 (W. D. Mo. 1972). *But see, Thompson v. State,* 61 *Wis.* 2d 325, 212 *N. W.* 2d 109 (1973).

---

[10]From a policy perspective it would seem that the diversion decision involves various decisions which lend themselves to the judge's adjudicatory skills. While we expect that the prosecutor's decision rarely will be overturned, review will guarantee that the judge's skill in assessing the various factors enumerated in Guideline 3 and in drawing legal conclusions from them are fully utilized.

## III

### SCOPE OF REVIEW

While judicial review is consistent with applicable principles under the separation of powers doctrine, we are of the opinion that the scope of such review should be limited. Thus, although review is necessary, the decision should lie, in the first instance, with the program director and prosecutor.

We are mindful of the prosecutor's duty to enforce the law and of the Legislature's authority to proscribe certain conduct and fix penalties for violations. Accordingly, great deference should be given to the prosecutor's determination not to consent to diversion. Except where there is such a showing of patent and gross abuse of discretion by the prosecutor, the designated judge is authorized under R. 3:28 to postpone proceedings against a defendant only where the defendant has been recommended for the program by the program director and with the consent of the prosecutor. R. 3:28(b). By emphasizing prosecutorial discretion we ensure that PTI will fulfill one of the motivating forces behind the program: the "need for prosecutorial options to augment those traditionally exercised by law enforcement authorities." 71 N. J. at 93.

The guidelines promulgated pursuant to our decision in *Leonardis* were intended to establish a heavy burden which the defendant must sustain in order to overcome a prosecutorial veto of his admission to PTI. Guideline 8 states, in pertinent part:

If a defendant desires to challenge the decision of a program director not to recommend enrollment or of a prosecutor refusing to consent to enrollment into a PTI program, a motion must be filed before the designated judge (or the Assignment Judge) authorized to enter orders under R. 3:28. *The challenge is to be based upon alleged arbitrary or capricious action and the defendant has the burden of showing that the program director or prosecutor abused his discretion in processing the application.*

[Emphasis added.]

This passage must be read in *pari materia* with Guideline 2 which states that the defendant must show "compelling reasons justifying his admission, and [establish] that a decision against enrollment would be arbitrary and unreasonable." A statement to the same effect is found in Guideline 3(i) which directs that

> where admission to a PTI program would deprecate the seriousness of defendant's crime, the defendant's application should generally be rejected. However, in such cases, the applicant shall have the opportunity to present to the program director, and through him to the prosecutor, any facts or materials demonstrating his amenability to the rehabilitative process, *showing compelling reasons justifying his admission and establishing that a decision against enrollment would be arbitrary and unreasonable.*
> [Emphasis added.]

Accordingly, these guidelines should be interpreted to require that the defendant clearly and convincingly establish that the prosecutor's refusal to sanction admission into the program was based on a patent and gross abuse of his discretion.[11]

In passing, it may be noted that Guideline 3(i) provides that any defendant charged with a crime is eligible for enrollment in a PTI program. In other words, every defendant is entitled to consideration. However, the prosecutor's refusal to consent or the court's denial of a diversion order may, where appropriate, be based solely on the nature of the offense charged.

Finally, it is important to reiterate our conclusion in *Leonardis* that review need not amount to a trial type

---

[11]This same standard of review should be applied regardless of the stage in the proceedings. The court should exercise this standard even when PTI is sought prior to indictment, and the prosecutor should consider the same factors enumerated in the guidelines. It should be noted that to the extent that PTI seeks to avoid the stigma of trial and excessive backlogs in the judicial system, the decision concerning intervention should be made at the earliest possible stage in the proceedings.

proceeding, but should be of an abbreviated and informal nature. 71 *N. J.* at 122. This hearing should not constitute a trial *de novo* on the applicant's admissibility, but should be confined to a *review* of the prosecutor's actions. *See State v. White,* 145 *N. J. Super.* 257 (Law Div. 1976). As we have stated, the purpose of the hearing is to afford the defendant an opportunity to demonstrate that the prosecutor and/or the program director acted in a grossly arbitrary or capricious manner in denying admission and that his conduct amounted to a patent abuse of discretion.[12] Consequently, it should not introduce the same delays which pretrial intervention was intended to avoid. A disposition by the trial court is appealable by leave of court as any interlocutory order. *R.* 2:2–2.

## IV

Pretrial intervention has earned the distinction of being characterized as "one of the more promising correctional treatment innovations in recent years." *Pretrial Intervention Legal Issues, supra,* at 1. Whether or not that promise is fulfilled will depend, to a great extent, on the efforts extended by the people who are responsible for the actual operation of the program — judges, lawyers, prosecutors, and program directors. It is especially important that in these

---

[12]At the hearing the trial judge should explain to the defendant that he is waiving his right to a speedy trial. In order to assure that the defendant consents to PTI in a knowing and intelligent manner, the trial judge should explain to him that he may be prosecuted at the end of the intervention period if his rehabilitation has not been satisfactory, or continued in the program for an additional period, at which time he is still subject to prosecution; that his participation in the program may be terminated prior to the normal period if there is cause; and that any delay in going to trial may have the effect of reducing his ability to obtain witnesses in his behalf.

We need not, at this point consider what procedures are necessary when a defendant's participation in PTI is terminated and he is returned to the normal criminal process. *See* R. 3:28(c)(3).

early stages of PTI's development, these individuals carefully follow the guidelines which have been promulgated. They are intended to provide both the flexibility and the uniformity which is necessary in order to carry out the goals of the program.

Our experiences with admission procedures are limited. We intend to continue our supervisory role over the operation of this program and the legal determinations of reviewing courts and local officials. We do not expect, however, that these proceedings will occupy a significant portion of trial or appellate court time. By their very nature, the guidelines place primary responsibility for evenhanded administration of the programs in the hands of the prosecutors and the program directors. Judicial review should be available to check only the most egregious examples of injustice and unfairness.

Accordingly, we reaffirm the constitutionality of pretrial intervention, and once again, stress the importance of following the uniform guidelines in making diversion decisions.

CONFORD, P. J. A. D., Temporarily Assigned, concurring in result. At the outset I stress, with emphasis, my agreement with the Court's conclusion that the Court has rule-making authority to provide, in certain narrowly defined circumstances, for diversion of a criminal proceeding without the consent of the prosecutor. I believe I am also in concurrence, as a matter of broad principle, with the Court's determination as to the nature of those circumstances. I file this opinion only because I am not in agreement with the rationale by which the Court reaches its conclusion as to its rule-making power and because I would refine the articulation of the criteria stated by the Court for overruling a prosecutor's decision not to consent to diversion.

Of the three questions upon which we requested argument at the rehearing,[1] the first listed in the footnote need not

---

[1] (1) The power of the Supreme Court, in the exercise of its adjudicative function, to declare the authority of the courts of this

be discussed since the Court has exercised its authority in the matter basically only in its rule-making, not its adjudicative function,[2] and we are unanimous that rule-making authority exists in the premises.

The issues on which we allowed reargument of *Leonardis I* did not exist prior to the decision of that case since our PTI rule (*R.* 3:28) theretofore made diversion of a defendant by the court absolutely conditional upon consent by the prosecutor. But shortly after the filing of *Leonardis I,* and to implement its rationale, the Court approved Guidelines for all PTI programs in the State, effective September 8, 1976, of which Guideline 8 provides, in part, that

\* \* \* [i]f a defendant desires to challenge the decision of a \* \* \* prosecutor refusing to consent to enrollment into a PTI program, a motion must be filed before the designated judge \* \* \*. The challenge is to be based upon alleged arbitrary or capricious action, and the defendant has the burden of showing that the \* \* \* prosecutor abused his discretion in processing the application.

Thus, as matters then stood, this Court had by rule created the machinery for judicial overruling of a prosecutorial decision to prosecute a defendant, even one who had been in-

---

State to divert a criminal proceeding, after a hearing, without the consent of the prosecutor, in the light of the doctrine of separation of powers;

(2) The power of the Supreme Court, in the exercise of its rule-making power, to declare the authority of the courts of this State to divert a criminal proceeding without the consent of the prosecutor;

(3) In respect of both of the foregoing, whether there is any distinction between proceedings post-indictment and pre-indictment.

[2]In a sense, the Court may be thought to have acted in the matter in its adjudicative capacity since the opinion in *State v. Leonardis,* 71 *N. J.* 85 (1976) (*"Leonardis I"*), construed preexisting *R.* 3:28, which contained no express provisions for judicial review of a prosecutor's refusal to consent to diversion, to contemplate judicial review of any *"ad hoc* or arbitrary determinations" of a prosecutor under the rule. 71 *N. J.* at 121; and see 71 *N. J.* at 108. In any event, as indicated in the text, Guideline 8, adopted by the Court September 8, 1976, expressly provides for review, on motion, of a prosecutor's refusal to consent.

dicted. It was the separation-of-powers implications of this action which moved the Court, after the filing by the Attorney General of a petition for clarification of *Leonardis I,* to grant that petition but limited to the separation-of-powers issues specified in note 1, *supra.*

I — *Basis for Separation-of-Powers Problem*

The Court's opinion does not squarely confront the separation-of-powers issue we carefully formulated in our order granting reargument. What concerned us at that time was the elemental consideration that basically a decision of a county prosecutor· (and, latterly, of the Attorney General) as to whether to prosecute a suspect for crime is a function of the Executive Branch of Government, not the Judicial Branch. *N. J. Const.* (1947), Art. III, par. 1; Art. V, Sec. 1, par. 11; *N. J. S. A.* 2A:158–5; *State v. Winne,* 12 *N. J.* 152, 171 (1953); *Morss v. Forbes,* 24 *N. J.* 341, 388 (1957) (Weintraub, C. J., dissenting in part); *Inmates of Attica Correctional Facility v. Rockefeller,* 477 *F.* 2d 375, 379–380 (2 Cir. 1973); *United States v. Cox,* 342 *F.* 2d 167 (5 Cir.), *cert.* den. 381 *U. S.* 935, 85 *S. Ct.* 1767, 14 *L. Ed.* 2d 700 (1965). The discharge of the discretionary charging function by prosecutors entails two kinds of decisions which will be seen to have differing relationships to a judicial power of oversight. One is the affirmative decision *to prosecute* a suspect; the other is the decision to *forego prosecution* of the suspect, whether absolutely or conditionally. That aspect of the PTI rule and guidelines which would authorize the Judiciary to veto a decision of the former kind is what creates the substantial separation-of-powers issue which engaged our interest in allowing reargument in this case.

To present the issue starkly, the question is whether, had the Court not adopted *R.* 3:28 in its original form, it would have had the power, without legislation, to adopt a rule of court simply providing that any defendant indicted for crime could bring on a motion before the court for deferral

of trial on a showing of the probability of his rehabilitation, with authority in the Court, over objection of the prosecutor, not only to defer trial but thereafter to dismiss the indictment upon a showing of defendant's rehabilitation after a specified period of time. I do not believe it can be seriously contended that such action by the Court would not be invalid as a raw usurpation of Executive authority by the Judiciary.[3]

How, then, does *R*. 3:28, supplemented by Guideline 8, encompassing as it does the prospect of judicial veto in specified circumstances of a prosecutorial decision to prosecute a suspect, rise above the separation-of-powers bar hypothesized above? The answer is not in generalizations as to "procedural alternatives" to trial (p. 368) or the inherent authority "to fashion remedies" (p. 369). Projection of those ideas begs the question as to whether the underlying authority or jurisdiction as to the prosecution function is not in the executive rather than the judicial sphere. Analysis is not aided by dealing with PTI as an undifferentiated lump-concept. I submit, rather, that the key to the question of judicial power in the matter lies in the crucial difference, adverted to above, between a prosecutor's affirmative decision *to prosecute* a suspect (or indicted person) and his decision *to desist from prosecution*. The latter type of decision lies at the heart of the PTI process, and, as will be seen, is within the inherent oversight of the Judicial Branch.

II — *Judicial Authority Over Dropping Prosecutions as the Source of Rule-Making Power.*

There is an unbroken line of authority that when the matter of a prosecutor's determination to discontinue or *nolle pros* a prosecution or indictment is involved, such action is subject to the approval of the court, at least where the matter

---

[3] A different question would be presented if the Legislature had enacted a statute giving an indicted defendant a right to apply for such relief.

has passed the formal complaint or indictment stage. *R. 3:25–1; State v. Ashby,* 43 *N. J.* 273, 276 (1964); *In re Investigation Regarding Ringwood Fact Finding Comm.,* 65 *N. J.* 512, 515–516 (1974); *State v. Conyers,* 58 *N. J.* 123, 146–147 (1971); *State v. Le Vien,* 44 *N. J.* 323, 327 (1965). Compare *Federal Rules of Criminal Procedure* 48(a).

The rationale for distinguishing the latter situation from one in which the prosecutor intends to go forward with a prosecution is fairly obvious. A prosecutor who is affirmatively prosecuting a criminal suspect when probable cause has been found is patently performing his duty to enforce the criminal law. *State v. Winne, supra.* It would be an arrogation of authority for a court to tell him to exercise his discretion differently (*i. e.,* not to prosecute). But where a prosecutor proposes to drop such a prosecution the possibility of connivance or culpable non-feasance, contrary to the public interest, activates a strong public policy for judicial superintendence of such a decision.

The consequent, accepted authority of the court to oversee the prosecutor's performance of his role in *ceasing* a prosecution affords the theoretical basis for this Court to undertake promulgation of rules and regulations in the area. The supervisory function which the Court always had the authority to assume on an *ad hoc* basis it may obviously discharge on a controlled and regulated basis. It is thus clearly appropriate for the Court to regulate the practice of judicial oversight of prosecutorial decisions to divert defendants from the criminal process by adopting rules controlling the procedure and setting the standards and criteria which the courts will apply in passing upon the grant of a particular application for pretrial diversion.

I am of course aware that *R. 3:28* does not undertake to deal with the whole area of prosecutorial discretion to cease or drop prosecutions. For example, a prosecutor may conclude that a criminal complaint involves a violation which is "technical or unintentional" so that the public interest would not be served by pursuing it, as in the *Ringwood* case,

*supra* (65 *N. J.* at 517). In such case there will not be a proposal for "intervention", but rather for freeing the suspect from further prosecution unconditionally. The Court has not adopted any rule creating standards for exercise of the discretionary role of the prosecutor in such instances.[4] This, however, is no reason why the Court should not have adopted *R.* 3:28, dealing with one kind of attempt at intervention of the criminal process by the prosecutor. Obviously the Court is not required to cover by rule-making all aspects of the procedure attendant upon judicial oversight of prosecutorial discretion in terminating prosecutions in order to validate rule-making as to one aspect.

### III — *Relationship Between Judicial Authority Over Dropping Prosecutions and Such Authority over Pursuing Prosecutions.*

The more difficult question then arises as to the extent to which the Court can by rule-making regulate the prosecutor's conduct when he determines, in the course of the intervention process fixed by *R.* 3:28, that he *will not* consent to the 3-month postponement specified by *R.* 3:28 (b) or to either a dismissal of the charges or a further 3-month postponement, as provided for by *R.* 3:28 (c) (1) and (2). This question encompasses the Court's power to permit judicial review of such a refusal for "abuse of discretion", Guideline 8, or on any other standard of review. At first blush, it would seem that if the prosecutor's affirmative decision to prosecute is unreviewable for discretion when there is no court rule on pre-trial intervention such a decision cannot automatically be rendered reviewable by the mere adoption of a practice rule founded on the court's acknowledged authority to oversee a

---

[4]There, is also the commonly used device of administrative closing of the file on a complaint notwithstanding judicial determination of probable cause or waiver thereof. See Attorney General's Formal Opinion No. 11–1976 (3–31–76).

prosecutor's decision not to prosecute. However, further reflection casts a different light on the matter.

What would seem ordinarily to constitute absolute judicial unreviewability as a matter of principle may perhaps be more plausibly explained by the impracticability of establishing such motivations as bad faith or unconstitutional discrimination when prosecutorial decision-making as to whether or not to prosecute is carried on *ad hoc* without visible controlling standards or regulations.[5] And since there are 21 prosecutors, some of whom have numerous assistants who exercise the actual decision-making function in this area, it would be questionable to attempt to justify an analogy of total unreviewability with the absolute immunity from judicial oversight of a governor's exercise, for example, of his power of veto over legislation. *Cf. Allan v. Durand,* 137 *N. J. L.* 30 (Sup. Ct. 1948); *Passaic County Bar Ass'n v. Hughes,* 108 *N. J. Super.* 161 (Ch. Div. 1969). Thus, when a prosecutor, on separation-of-power grounds, questioned the power of a legislative committee to compel him to disclose names of wiretappers working for .him, the Court held that "the executive chain of command is not sufficiently prominent to enable the prosecutor to claim any high prerogative which might be enjoyed by the state executive with respect to withholding information from the Legislature". *Morss v. Forbes, supra,* 24 *N. J.* at 372–373. See also the concurring opinion of Justice Jacobs in the same case (at 377–378).

The actual existence of court rules and guidelines with respect to pretrial intervention becomes material to the question of legitimacy of judicial review of prosecutorial insistence on prosecution in two respects. Firstly, the enunciation of standards and criteria to govern a prosecutor's assent to intervention also provides at least a partial basis upon which to determine whether a refusal to assent is arbitrary, not an honest exercise of discretion in good faith, or dis-

---

[5]See Cox, "Prosecutorial Discretion: An Overview", 13 *Am. Cr. L. Rev.* 383, 407–408, 433 (1976).

criminatorily motivated contrary to principles of equal protection, whichever of these may be determined to be appropriate criteria for judicial review of the exercise of discretion. Secondly, the formal existence of such rules *per se* creates a species of new right on the part of the defendant — a right he did not have before — to make application for and have formal consideration of an application for pretrial intervention. The existence of such a procedure should engender, in a system of criminal justice committed to the notion of fundamental fairness, an assurance to applicants for relief of at least a degree of relative fairness and impartiality in the treatment of applications. *Cf. Monks v. N. J. State Parole Board,* 58 *N. J.* 238, 246–248 (1971); *State v. Kunz,* 55 *N. J.* 128, 144–145 (1969); *Avant v. Clifford,* 67 *N. J.* 496, 520–521 (1975).[6]

I thus conclude that the constitutional authority for judicial review of prosecutorial refusal to consent to pretrial intervention can survive the principle of separation of powers against the background of formal PTI rules, but that the criteria for overruling such a decision of the prosecutor must be extremely narrow. I proceed to the consideration of those criteria.

IV — *Scope of Judicial Review of Prosecutorial Decision not to Consent to Intervention.*

As noted above, Guideline 8 fixes the criterion in this regard as being whether the prosecutor's action is "arbitrary and capricious". Reversal of the veto is only on a showing of "an abuse of discretion". The Court's present opinion

---

[6]There may possibly also come into play in this connection the principle that although the State is not obliged to confer a right (*e. g.,* on prisoners), nevertheless if it undertakes to do so, due process demands that the right not be taken away except on procedures carrying protection against arbitrary abrogation of the right. *Wolff v. McDonnell,* 418 *U. S.* 539, 557, 94 *S. Ct.* 2963, 41 *L. Ed.* 2d 935 (1974); and see *Griffin v. Illinois,* 351 *U. S.* 12, 18, 76 *S. Ct.* 585, 100 *L. Ed.* 891 (1956).

tightens those standards considerably. The prosecutor's refusal to consent must be shown to amount to "patent and gross abuse", pp. 376, 381. The guidelines are designed "to establish a heavy burden which the defendant must sustain in order to overcome a prosecutorial veto * * *", p. 381. "These guidelines should be interpreted to require that the defendant clearly and convincingly establish that the prosecutor's refusal * * * was based on a patent and gross abuse [of the exercise] of his discretion." P. 382. "By their very nature, the guidelines place primary responsibility for even-handed administration of the programs in the hands of the prosecutors and the program directors. Judicial review should be available to check only the most egregious examples of injustice and unfairness". P. 384.

The opinion also clarifies, constructively, an ambiguity in *Leonardis I* as to whether the prosecutor's decision to refuse consent can ultimately rest alone on the nature of the offense involved. It can; p. 382. Compare 71 *N. J.* at 113.[7]

Nevertheless, and despite the salutary emphasis in the Court's opinion on the breadth of the prosecutor's discretion in refusing consent, my concurrence in the Court's disposition of this reargument is premised on my reading of the Court's present opinion to imply a gloss on the guideline criterion, "arbitrary or capricious action," restricting judicial interference with the exercise of prosecutorial discretion considerably more tightly than under the conventional concept of judicial review of administrative action for arbitrariness. In my judgment, the range of considerations which can legitimately motivate a prosecutor to opt for prosecution of a particular offender is almost too broad for articulation in a set of guidelines and certainly transcends in breadth the standards commonly controlling exercises of discretion by the typical executive administrative agency.

---

[7] "In no case, however, should the trial court deny a hearing or refuse intervention solely by reason of the nature of the crime of which defendant is accused."

As accurately argued to us by the Attorney General in this case:

A broad spectrum of facts must of necessity be evaluated by the prosecuting attorney in discharging his duty [in deciding on prosecution]. The evidentiary strength of the State's case, the culpability and background of the accused, the urgency of deterrence in a particular class of offenses, the most efficacious allocation of law enforcement resources, and the attitudes of the victim and the community, are but a few of the most obvious considerations. The number of variables defies precise classification.[8]

Justice Pashman covered the same ground in his concurring and dissenting opinion in *In re Investigation Regarding Ringwood Fact Finding Comm., supra* (65 *N. J.* 531 at 531–532) when he said: "more factors enter the prosecutor's decision [whether to drop or proceed with a prosecution] than whether the technical requirements of an offense are present". He then enumerated the following: circumstances of the act, expectations of the Legislature, considerations of fair play, character and history of the offender, nature of the offense, harm to the victim and nature of the locale. To these must be added, as pointed out by the Attorney General, the expectations of the victim and of the community. It is obvious that a prosecutor's decision *to decline consent* to a particular application for pretrial intervention can legitimately

---

[8]Compare the observations of a respected federal court in dealing with the converse problem of judicial review of a prosecutorial decision *not* to prosecute a particular offense. After outlining some of the imponderables which go into such a determination by a prosecutor, the court in *Inmates of Attica Correctional Facility v. Rockefeller, supra,* said (477 *F.* 2d at 380–381) :

These difficult questions engender serious doubts as to the judiciary's capacity to review and as to the problem of arbitrariness inherent in any judicial decision to order prosecution. On balance, we believe that substitution of a court's decision to compel prosecution for the U. S. Attorney's decision not to prosecute, even upon an abuse of discretion standard of review and even if limited to directing that a prosecution be undertaken in good faith, see Note, Discretion to Prosecute Federal Civil Rights Crimes, 74 *Yale L. J.* 1297, 1310–12 (1965), would be unwise.

be based upon a discretionary weighing of an amalgam of some or all of the factors thus mentioned by Justice Pashman and by the Attorney General as well as those set forth in the pretrial intervention guidelines.[9]

It is essential to note that in consequence of the foregoing considerations the factors to be taken into account by the Court on a motion by a defendant addressed to the alleged arbitrariness of *a refusal by* a prosecutor to consent to intervention cannot be confined to the guidelines for intervention adopted by the Court. See Guideline 3. They necessarily include the other discretionary considerations alluded to above. In contrast, those guidelines "along with other relevant circumstances" do set forth all the criteria to be given consideration by the program director, the prosecutor and the court before *affirmative action* on an application for intervention.

In my judgment, a trial court called upon to consider whether a prosecutor's refusal to consent to intervention is "clearly and convincingly" shown to be a "gross abuse of the exercise of his discretion", as specified by the Court's present opinion, should properly employ the measuring yardstick of whether the applicant has demonstrated that the prosecutor has failed to make an honest appraisal of the relevant circumstances and conditions in good faith. Stated alternatively, the movant should be required to establish bad faith on the part of the prosecutor.[10] This Court has quoted with approval an expression by the Supreme Court of Missouri that the earmark of the correct exercise of discretion by a prosecutor in making a decision as to prosecution in a particular case is whether there has been "a good

---

[9]See A.B.A. Standards Relating to the Prosecution Function and the Defense Function, § 3.9. Discretion in the Charging Function, p. 33 (Appr. Dr. 1971).

[10]It goes without saying that a refusal to consent can also be rejected if motivated by considerations impinging unconstitutionally upon a defendant's due process or equal protection rights.

faith exercise of * * * sound discretion", or, otherwise stated, whether the prosecutor has chosen his course "willfully or in bad faith * * *". *State v. Le Vien, supra,* 44 *N. J.* at 327. *Cf. State v. Winne, supra,* 12 *N. J.* at 174; *State v. Begyn,* 34 *N. J.* 35, 50 (1961); *State v. Williamson,* 54 *N. J. Super.* 170, 185 (App. Div.) aff'd o. b. 31 *N. J.* 16 (1959), and see *id.* at 22 (Weintraub, C. J., concurring); *cf. State v. Savoie,* 67 *N. J.* 439, 461–462, n. 7 (1975).

In concurring in this case I am assuming that the foregoing views as to the criteria for judicial review of a prosecutor's refusal to consent to intervention are consistent with the Court's opinion herein.

CONFORD, P. J. A. D., concurring in the result.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For reversal*—None.