733 A.2d 497 (1999)
323 N.J. Super. 360
STATE of New Jersey, Plaintiff-Appellant,
v.
Brian SEYLER, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted December 14, 1998.
Decided June 30, 1999.
*498 Jeffrey S. Blitz, Atlantic County Prosecutor, attorney for defendant-respondent (James F. Smith, Assistant Prosecutor, on the brief).
Mark E. Roddy, Atlantic City, attorney for defendant-respondent.
Before Judges SKILLMAN, PAUL G. LEVY and LESEMANN.
The opinion of the court was delivered by SKILLMAN, J.A.D.
The State appeals from an order of the Law Division, directing defendant's admission into the Atlantic County Pretrial Intervention Program (PTI) over the prosecutor's objection.
Defendant was indicted for third degree theft, in violation of N.J.S.A. 2C:20-4, and six counts of fourth degree unsworn falsification to authorities, in violation of N.J.S.A. 2C:28-3a. During the period of time covered by the indictment, defendant, a former police officer, was attending the University of Medicine and Dentistry of New Jersey. The indictment alleged that defendant fraudulently obtained welfare benefits, food stamps and Medicaid over the entire period he attended medical school by filing a series of applications for benefits which failed to disclose that he was receiving a substantial amount of money from the University for his living expenses.
The evidence which forms the basis of the indictment is set forth in an investigatory report which not only describes the alleged acts of welfare fraud which defendant committed while attending medical school but also indicates that defendant probably committed additional acts of welfare fraud while an undergraduate at Stockton State College. This report states in pertinent part:
Brian Seyler failed to disclose to his case worker loans, grants, scholarships, and other forms of financial resources when he was student at Stockton State College and at the University of Medicine and Dentistry of New Jersey. From the Fall of 1994 to the Fall of 1997, Brian Seyler received various forms of student financial aid. After tuition was paid, he was given additional funds for "living expenses" amounting to $53,358.57 for *499 that three year period, averaging $17,786.19 a year for each of those years. None of this money was reported to his case worker when he completed the standard form PA 1J, a 16 page, "Application & Affidavit for Public Assistance", a document he completed six (6) separate times during the period from 1994 to 1997.
....
Seyler was issued an insurance settlement check for $132,207.43 on July 12, 1990. Although he voluntarily withdrew from Public assistance at that time, he failed to report any portion of that resource when he re-applied for Public Assistance in 1992, and on subsequent PA 1J's.
When Seyler re-applied for Public Assistance on 1-13-92, he stated that he had been receiving a disability check for personal injury in the amount of $318.92 per month, but stated that he no longer received the money as it had run out on January 8, 1992. When [the county welfare board investigator] checked with Liberty Mutual Insurance Company, who paid Seyler, she discovered that the payments were in full force, that a balance of $6,000 existed, and that Seyler would be paid the monthly amount until that $6,000 was exhausted.
Subpoenaed Collective Bank records for Seyler's account reveal that he deposited $4,248.53 into checking on January 12, 1990. This amount was not reported to his case worker and, according to [the welfare board investigator], this amount alone would have precluded Seyler from receiving AFDC and Food Stamp Assistance.
....
Each time Brian Seyler completed a PA 1J form (eleven times since the inception of his case in 1989) he was asked specific questions regarding financial resources, such as loans and grants, and each time he stated that he had no such resources except for a $1,200 PELL Grant in 1992. The record reflects otherwise in fact, he received $30,064 in Financial Aid during the 1996-97 academic year.
Additionally, Brian Seyler failed to disclose that he had received his $132,207.43 settlement check even after he signed [the] Form PA-10D, Agreement to Repay, on May 31, 1989.
....

 FINANCIAL AID SUMMARY
 Brian Seyler
Program AY 94-95 AY 95-96 AY96-97 AY97-98
Total Budget $27,473.00 $32,767.00 $30,137.00 $28,654.00
Loans:
Federal Stafford Loan 4,461.00 8,500.00 6,526.00 7,554.00
Unsubsidized Federal
Stafford Loan 2,972.00
Federal Perkins Loan 3,267.00 2,600.00 3,719.00 2,700.00
Scholarships:
Martin Luther King
Physician/Dentist
Scholarship 12,795.00 13,295.00 14,492.00 12,500.00
Atlantic County
Medical Society
Auxiliary Sch. 500.00
Atlantic County
Medical Society
Scholarship 1,250.00 1,250.00 1,250.00 1,250.00
Grants:
Educational
Opportunity
Fund Grant 4,000.00 4,150.00 4,150.00 4,150.00
Total Awarded $26,273.00 $32,767.00 $30,137.00 $28,654.00

*500 The prosecutor gave a clear and persuasive explanation of his reasons for denying defendant's PTI application:[1]
The reasons for rejection include the nature of the offense, the facts of the case and the conclusion that the possibility of a collateral detriment as it relates to this defendant's ability to practice medicine in the state of New Jersey is outweighed by the need to deter this defendant and others.
It is charged that this defendant committed welfare fraud over a three year period from 1994 through 1997. It is charged that, in furtherance of this welfare fraud, he committed six separate acts of unsworn falsification for failing to disclose substantial living expense awards which would have resulted in his ineligibility for the benefits he stole. The dollar amount involved in the theft exceeds $22,000.00.
In assessing the nature of the offenses charged, the State concludes that, pursuant to Guideline 3(i)(2) the defendant's conduct was "part of a continuing criminal... enterprise." As such, there is a presumption that such an application should generally be rejected. The alleged criminal misconduct was of a continuing nature spread over a three year period and included six separate acts of failure to disclose relevant information to the welfare board. Such continuing criminal misconduct resulted in the diversion of scarce welfare benefits, in excess of $22,000.00, from availability for those whose financial situation rendered them lawfully eligible for such funds. Under circumstances where the criminal enterprise is so continuous, and the dollar amount so high, the presumption against diversion is evident.
In assessing the continuous nature of this defendant's criminal enterprise with respect to his unlawful acquisition of welfare, the State also considered uncharged conduct reflected in the welfare investigation. This conduct consisted of the failure to disclose the proceeds of a civil settlement in excess of $130,000.00 and a failure to disclose accurately the remaining amount of disability to which the defendant was entitled. Additionally, there is an apparent failure to disclose a deposit in excess of $4,000.00, all of which is reflected in additional discovery material prepared by an investigator from this Office.... This additional misconduct is considered as bearing upon the conclusion that the thefts actually charged in the indictment were intentional.
Essentially, what this defendant did was to make a conscious decision to "take" the public's money to finance his private life while pursuing his private vocational goals. Absent a formal criminal prosecution and conviction, such conduct would be viewed as no more burdensome than an interest free loan. Specific and general deterrence requires more, and it is the State's conclusion that a formal criminal prosecution is warranted.
It should also be noted that the case arose as a result of information supplied to the welfare board by another. There is no evidence that this defendant would have, on his own, disclosed his continuous receipt of benefits to which he was *501 not legally entitled. But for the investigation, welfare's money would be gone.
The State has reviewed the substantial "compelling reasons" information supplied by defense counsel. The information packet includes an explanation of the extent to which the defendant's life was affected by a motor vehicle collision and attempts to explain the choices the defendant made. The materials also disclose prior involvement by this defendant with law enforcement and the military along with a positive record in college and medical school. It is the State's conclusion, however, that this information does not overcome the presumption against diversion for a crime of this nature and that, additionally, the need for strong specific and general deterrence warrants formal criminal prosecution. The fact remains that this defendant failed to disclose receiving over $53,000.00, over a three year period, in reportable living expenses. This willful failure to disclose resulted in the diversion of more than $22,000.00 in welfare benefits from persons whose financial situation rendered them legally appropriate. The State does not seek to punish the defendant for the choices that he made. As a practical matter, however, he was not entitled to make those choices by requiring that the public's money be used to finance the life he wanted to have and a career he wanted to pursue.
The State is aware that the decision not to divert could possibly interfere with the defendant's ability to practice medicine in the state of New Jersey. Though the material submitted by defense counsel concludes that such a bar will occur, your report indicates that the decision will be made by the State Board of Medical Examiners on an individualized basis and that there is no automatic bar to practice. Formal criminal prosecution will not prevent this defendant from attempting to demonstrate to the Board that, under the facts and circumstances of this case, he is nonetheless a qualified individual to be licensed to practice medicine. This defendant's success or failure in that regard can not be permitted to control the State's judgement in favor of formal criminal prosecution, as expressed above. The objects of the criminal justice system and the medical board system are different and their respective considerations are distinct from each other.
After a further review of the matter, the prosecutor gave the following supplemental reasons for denying defendant's application:
This defendant could have chosen to forgo medical school until he had earned enough money to pay for it. Given the willingness of relatives to now loan him the money to make restitution, it may well be that this defendant could have chosen to ask for such a loan to help finance his medical school training. While neither of these choices may have been appealing ones, this does not justify the conscious decision to take the public's money when not entitled to do so for private gain with the expectation of never having to pay a price for that theft if he were caught. It is the State's conclusion that the price for choosing to steal the public's money for private gain should be formal criminal prosecution.
Before ordering a defendant to be admitted into PTI over the prosecutor's objection, a trial court must find that defendant "clearly and convincingly establish[ed] that the prosecutor's refusal to sanction admission into the program was based on a patent and gross abuse of ... discretion." State v. Wallace, 146 N.J. 576, 582, 684 A.2d 1355 (1996) (quoting State v. Leonardis, 73 N.J. 360, 382, 375 A.2d 607 (1977)). "A `patent and gross abuse of discretion' is more than just an abuse of discretion as traditionally conceived; it is a prosecutorial decision that `has gone so wide of the mark sought to be accomplished by PTI that fundamental fairness and justice require judicial intervention.'" *502 Id. at 582-83, 684 A.2d 1355 (quoting State v. Ridgway, 208 N.J.Super. 118, 130, 504 A.2d 1241 (Law Div.1985)). The Supreme Court has characterized this as a "highly deferential standard of review." Id. at 589, 684 A.2d 1355. Under this standard, we are unable to conclude that the prosecutor's rejection of defendant's PTI application constituted a patent and gross abuse of discretion.
The prosecutor correctly concluded that the pending charges against defendant fall under PTI Guideline 3(i)(2). This Guideline states that if a defendant is charged with a crime which is "part of a continuing criminal business or enterprise..., [his PTI application] should generally be rejected." If the charges against defendant can be proven at a trial, there would be no doubt he engaged in a long-term, calculated scheme to defraud the State of welfare funds by repeatedly lying about his financial circumstances. Our courts have previously recognized that such fraudulent conduct constitutes a "continuing criminal business or enterprise" within the intent of PTI Guideline 3(i)(2). State v. Sutton, 80 N.J. 110, 117-18, 402 A.2d 230 (1979); State v. Burger, 222 N.J.Super. 336, 341, 536 A.2d 1295 (App. Div.1988).
Sutton involved the denial of a PTI application by a welfare recipient who failed to report approximately $50 per week she received from work as a part-time school bus driver. Although the Court remanded the case for a hearing on defendant's claim that the denial of her application constituted a patent and gross abuse of discretion because the prosecutor regularly consented to PTI applications of other persons charged with similar offenses,[2] the Court indicated that the *503 denial of defendant's application would be sustainable if she had been treated the same as other identically situated defendants:
Defendant did not merely fail to report one or a few sporadic accessions to her income. Rather, over a four and one half year period, she regularly received compensation deriving from her employment as a part-time school bus driver....
The prosecutor thus properly characterized defendant's crime as falling within the ambit of Guideline 3(i)(2) and thus "generally" to result in rejection from PTI. We are cognizant that defendant's misconduct was precipitated in large part by her desire to adequately feed and clothe her children, and that she has never had any other confrontations with the law. However, ... in the absence of evidence clearly demonstrating the contrary, we must presume that the prosecutor took these factors into account before arriving at his decision. Notwithstanding our sympathy for defendant's plight, were this defendant's only assignment of prosecutorial error, we would be constrained to hold that the decision to reject defendant was not so arbitrary as to constitute a patent and gross abuse of discretion.
[80 N.J. at 118, 402 A.2d 230 (citations omitted).]
Because defendant is charged with offenses which fall within PTI Guideline 3(i)(2) and thus is presumptively ineligible for admission into PTI, he was required to present facts or materials "demonstrating [his] amenability to the rehabilitative process" and "showing compelling reasons justifying [his] admission and establishing that a decision against enrollment would be arbitrary and unreasonable." PTI Guidelines 2, 3(i); see State v. Caliguiri, 158 N.J. 28, 36, 726 A.2d 912 (1999). In determining whether the reasons defendant relied upon to justify his admission into PTI are "compelling," the prosecutor and any reviewing court are required to consider the criteria set forth in N.J.S.A. 2C:43-12. See Caliguiri, supra, 158 N.J. at 35, 726 A.2d 912. These criteria include "[t]he nature of the offense," N.J.S.A. 2C:43-12(e)(1), "[t]he facts of the case," N.J.S.A. 2C:43-12(e)(2), "[t]he needs and interests of ... society," N.J.S.A. 2C:43-12(e)(7), and "[w]hether or not the crime is of such a nature that the value of supervisory treatment would be outweighed by the public need for prosecution." N.J.S.A. 2C:43-12(e)(14). See Wallace, supra, 146 N.J. at 585-86, 684 A.2d 1355; State v. Imbriani, 291 N.J.Super. 171, 178-82, 677 A.2d 211 (App.Div.1996); State v. Rosario, 237 N.J.Super. 63, 70, 566 A.2d 1173 (App. Div.1989), certif. denied, 122 N.J. 139, 584 A.2d 212 (1990). Under these criteria, the interests of society may justify the denial of an application for admission into PTI even though a defendant has led an exemplary life except for the conduct which forms the basis of the pending criminal charges. See Nwobu, supra, 139 N.J. at 259-60, 652 A.2d 1209; Imbriani, supra, 291 N.J.Super. at 179-80, 677 A.2d 211.
The dissent concludes that the primary "compelling reason" for defendant's admission into PTI is that denial of his application will prevent him from becoming a doctor. However, it is not the judiciary's responsibility to determine whether a person who has been charged with serious criminal offenses has the moral character to practice medicine; the Legislature has conferred that responsibility upon the Board of Medical Examiners (the Board). N.J.S.A. 45:9-1 to -27.9. One of the qualifications which the Board must consider in reviewing an application for a medical license is "good moral character." N.J.S.A. 45:9-6. In addition, the Board is authorized to deny an application by a person who "has been convicted of a crime involving moral turpitude," N.J.S.A. 45:9-16(c), or "relating adversely to the activity regulated by the board." N.J.S.A. 45:1-21(f). To perform its responsibilities under these statutory provisions, the Board has established *504 a "Credentials Committee." Defendant submitted a letter by Dr. Grossman, a former chairman of this committee, which describes how the committee would review defendant's application for licensure if he were convicted of welfare fraud:
[H]is application for licensure would be separated out from other applications and directed to the Credentials Committee. The Credentials Committee would review the application and almost without fail would certainly insist on a personal interview with this young man. During the personal interview, they would attempt to understand what circumstances prevailed that caused him to be convicted of a crime.... The Credentials Committee would then make a recommendation to the full board which would have to discuss this matter and vote on it before granting or denying a license.
We are firmly convinced that, despite the impressiveness of defendant's educational achievements, the charge that he engaged in a long-term scheme of welfare fraud while attending medical school warrants careful scrutiny by the Credentials Committee to determine whether he is morally fit to practice medicine. A hearing before the Credentials Committee would afford defendant an opportunity to present the materials which he has relied upon in support of his PTI application to the agency which the Legislature has entrusted with the responsibility to determine whether a medical school graduate has the moral character to practice medicine. It also would afford the Credentials Committee an opportunity to evaluate all aspects of defendant's record, including not only the conduct upon which his indictment is based and the exemplary aspects of his life described at great length in the dissenting opinion, but also the circumstances underlying the shoplifting charges against defendant as well as the other apparent fraudulent conduct described in the prosecutor's statement of reasons for the denial of his PTI application.[3] In our view, defendant should not be allowed to use PTI as a means to circumvent this statutorily mandated process for review of the qualifications of an applicant for a medical license.
The dissent heavily relies upon State v. Mickens, supra, in which a panel of this court overturned a prosecutor's refusal to consent to a PTI application by a welfare recipient charged with welfare fraud based on her failure to report income from a job paying four to five dollars an hour. The panel emphasized that when defendant committed this fraud, she and her three children were living in an "undesirable" welfare hotel, 236 N.J.Super. at 274, 565 A.2d 720, and that defendant suffered from "the employment limitations of a high school education obtained in an urban ghetto." Id. at 278, 565 A.2d 720. Under these circumstances, the panel concluded that "defendant's crime is forgivable, and not to forgive it by her PTI admission makes a mockery of the rehabilitative purpose of PTI." Id. at 279, 565 A.2d 720.
*505 When defendant committed welfare fraud, he was not in similar financial straits. He owned a home which he had bought in an all cash transaction with a portion of the proceeds from a $132,207.43 recovery in a personal injury action. As a result, he was able to provide housing for himself, his fiancée and child without any obligation to make monthly mortgage payments. In addition, he was receiving an average of $17,786.19 per year for his other living expenses in the form of grants, scholarships, and loans from the federal government and various private sources. Furthermore, his fiancée, who is a physician's assistant, was contributing to the support of the household. Although the money available to defendant was significantly less than would be required to maintain an affluent lifestyle, it was substantially more than was available to Sutton, Mickens or the typical welfare recipient.
Although the dissent places great emphasis upon defendant's employment history, educational attainments and economic prospects as a doctor in concluding that he deserves "a second chance" (dissenting op. at 390, 733 A.2d at 515), the prosecutor justifiably relied upon many of these same circumstances in concluding that "the need for strong specific and general deterrence warrants criminal prosecution." Defendant was not driven to commit welfare fraud by extreme economic circumstances. He was a college graduate with a substantial employment history who undoubtedly could have obtained employment to support himself and his family but instead elected to attend medical school. Consequently, there is adequate support for the prosecutor's conclusion that "what this defendant did was to make a conscious decision to `take' the public's money to finance his private life while pursuing his private vocational goals." Moreover, the medical school's administrators undoubtedly conducted a comprehensive evaluation of defendant's economic needs in determining to award him more than $53,000 in scholarships, grants and loans for his living expenses while attending medical school. Additionally, as a former police officer, defendant was presumably aware of the seriousness of his fraudulent conduct and the consequences he would face if he were caught. Therefore, we conclude that the prosecutor's determination that defendant should be excluded from the PTI program in order to deter systematic welfare fraud by persons with ample means of available support did not constitute a patent and gross abuse of discretion.
Accordingly, the order directing defendant's admission into PTI is reversed, and the case is remanded for trial.
LESEMANN, J.S.C. (temporarily assigned), dissenting.
In its opinion, the majority skims rather lightly over the facts of this case. Those facts, however, are extraordinaryso extraordinary that I believe this is one of those rare cases in which, even granting the State the enhanced deference due to a prosecutor concerning admission to PTI, the prosecutor's decision represents a patent and gross abuse of discretion. I am also satisfied that this is not a case in which the State failed to consider all relevant factors (which might warrant a remand for further consideration) but rather "arises from a clear error of judgment" and thus the appropriate remedy is an order directing defendant's admission into the program. State v. DeMarco, 107 N.J. 562, 567, 527 A.2d 417 (1987). Accordingly, I would affirm the decision of the Law Division, and thus I dissent from the majority's conclusion to the contrary.
At the time of his indictment for welfare fraud, defendant was thirty-four years old. He was a single parent of two children. He lived with one of them and visited the other three to four times a week. He was also about to enter his last semester at the University of Medicine and Dentistry of New Jersey (UMDNJ). He has now graduated from medical school with a degree in Osteopathic medicine and is serving a residency *506 in the Atlantic City Medical Center. However, the medical career for which he has prepared himself is in jeopardy. If he is not admitted to PTI, his conviction may well prevent his becoming licensed to practice his profession or, if he does obtain a license, it may nevertheless have such an adverse effect as to make his practicing medicine a practical impossibility.
Defendant's accomplishments were described by the trial court as a "phenomenal series of feats." That statement is not an exaggeration. The trial court listed those accomplishments and what it regarded as "compelling reasons" for defendant's admission into PTI in a comprehensive, well-reasoned opinion which I find sound and which I adopt.
At the age of seventeen, defendant enrolled in a specialized United States Army program which contemplated a return to high school following completion of the program. Defendant's record in the Army was exemplary and he received a number of citations and accolades. He then returned to high school but continued to serve in the Army Reserve. He was promoted to sergeant and, again, received a number of commendations for excellent performance.
Between 1982 and 1984, defendant graduated from high school, married and had a child. He also became a policeman in Ventnor City where he stayed until 1986 when he accepted an offer from the Army to attend aviator's school in Alabama. By then, however, he and his wife had divorced. He had custody of their child, and his living in Alabama while his ex-wife lived in New Jersey became unworkable in terms of visitation. He therefore left the Army and returned to New Jersey where he lived with his daughter. Shortly thereafter, he was involved in a serious automobile accident, suffering back injuries which required a spinal fusion, a number of operations, and a long rehabilitation.
In 1989, defendant enrolled as a full-time student in Stockton State College. At about the same time he began receiving welfare benefits on behalf of himself and his daughter. He received those benefits from February to July 1990, when he received a settlement payment of approximately $130,000 from his automobile accident. He discontinued his welfare benefits and used the settlement proceeds to repay a series of loans he had obtained from his parents and other relatives since his accident, to buy a "fixer upper" home, a car, and to meet some other pressing obligations.
The "fixer upper," defendant says, turned into a "money pit" and as he continued attending college with no job, the remaining proceeds of the settlement were gone in approximately one year. In January 1992, defendant again began receiving welfare benefits and he continued to receive those benefits until April 30, 1997. During that time he received a series of grants, loans and other academic benefits and payments which he applied to his school tuition and both his and his daughter's living expenses. Those benefits exceeded his actual tuition expense by an average of $17,786 per year over three yearsa total of $53,358. He did not disclose the overages to the welfare authorities and thus he continued receiving welfare benefits to which he was not entitled. It is that non-disclosure and wrongful receipt of benefits for which he was indicted.
Defendant's record at Stockton State College shows that of thirty-six grades received between 1989 and 1993, defendant received thirty-four A's and two B's. For at least one semester he was on the Dean's list. He received his Bachelor of Science degree in December 1993, when he was also admitted to the UMDNJ School of Osteopathic Medicine. He began attending medical school the following September and graduated in May 1998.
In his application for admission to PTI, defendant described his financial condition while he attended college and medical school:

*507 I had nothing. I had no money and my kids needed medical insurance and necessities. Before the settlement I borrowed lots of money from my parents and my son's mother.... After I got the settlement money I discontinued the welfare benefits. I didn't tell them why. I never thought I'd have to collect again, but I did. I reported the lawsuit award to welfare but told them that the money was gone. I showed them the title to my house. During that time I also received grant, scholarship and student loan monies during my second period of welfare. I had been borrowing from my credit cards throughout that time to the amount of $35,000. I had debts related to my family's living expenses. I used student loans to pay my credit cards.
My daughter did live with me during that time, however, she did visit overnight with her grandparents occasionally. That has not been the case during the past four years when she stayed exclusively with me.
* * *
I did not use any of the money received for anything other than the support of my family. I made very bad choices but I felt they were the only choices at those times. I am very sorry and truly remorseful for what I did. I have worked very hard to try to make something for myself and my family and wish to become an asset to society rather than an expense.
In the PTI submission defendant's attorney added that defendant had been featured in the medical school magazine, "Health State," because of his multiple accomplishments while attending medical school. He also noted that defendant had been elected president of the Undergraduate American Academy of Osteopathy and had developed a separate expertise in acupuncture. He added the following:
Brian dealt with a number of [welfare] intake officers, and he was under the impression that all of them were aware that he had numerous student loans to finance both his undergraduate and graduate education. They were also aware that the proceeds from his auto accident were exhausted, and that he had used virtually all of the proceeds to purchase the home and fix it up for his two children. Frankly, virtually every welfare officer that Brian dealt with was exceptionally impressed with his dedication to his children, his education, and his desire to achieve professional success despite the fact that he had suffered a serious physical injury and was essentially supporting two children at the same time. On more than one occasion, he was told he was a "model recipient" because of his industriousness in his desire to further himself.[1]
Defense counsel also advised that defendant's relatives had promised that they would, among themselves, raise $22,824 to make full restitution for the improperly received welfare benefits. Counsel has now represented to the trial court that he has that sum in his trust account so that restitution can be made immediately.
Finally, defense counsel presented to the prosecutor, and thereafter to the trial court, a letter from Dr. Michael B. Grossman, a former member and president of the New Jersey State Board of Medical Examiners, a former Chairman of the Board's Credentials Committee, and a faculty member at the UMDNJ School of Osteopathic Medicine. Dr. Grossman set out his opinion as to the effect a conviction would have on defendant's future in the medical profession:
A conviction of a crime of moral turpitude would cause Brian very significant difficulties in obtaining a medical license. It would require an individual hearing before the Credentials Committee and one could not be sure of what decision *508 would emerge from such a hearing. [The Committee] may very well refuse to grant licensure.
If a license were granted, he said, it would necessarily be one marked "with some abnormalities or conditions attached to it. It would not be a routine simple licensure."
Dr. Grossman also said that even if defendant obtained the necessary license,
there would be considerable reluctance on the part of training programs to accept [him].... There would also be considerable difficulty when he applies to a medical staff of a hospital. Certainly he would be at the bottom of the list if there were more than one applicant for any position open.... I was involved intimately in hiring new physicians and an applicant with this kind of a mark on his record would be one that I would be most reluctant to hire.
Dr. Grossman then referred to what he described as "an even greater difficulty." He said that with a criminal conviction, defendant
would most likely have an extremely difficult time being granted a provider number by the HMO's. AETNA, U.S. Healthcare and New Jersey Blue Cross/ Blue Shield would be very reluctant and possibly unwilling to grant him status as a provider. Since those organizations virtually control the insurance market, a physician literally can't practice without being a provider. Therefore, that creates strike number three in this very difficult situation.
Dr. Grossman summed up the situation:
In summary, I was asked if Brian Seyler would have difficulties being licensed and obtaining employment were he to be found guilty of a crime of moral turpitude. The answer unequivocally is yes. He will have a significant chance of not being allowed to become licensed in the state. If he is allowed to become licensed in the state, his license will not be pristine but in fact will be marked. That will make it extremely difficult for him to find employment. In addition, the managed care organizations will undoubtedly make it a lengthy and difficult process for him to become a provider. In fact, it is possible that he may not be allowed to become a provider.[2]
The PTI manager recommended defendant's admission to the PTI program, conditioned on restitution and the performance of 100 hours of community service. The prosecutor, however, vetoed that recommendation and refused his consent to defendant's entry into PTI. His reasoning is not easy to follow.
In his first rejection letter the prosecutor said that under PTI Guideline 3(1)(2), the defendant's conduct was "part of a continuing criminal ... enterprise" and thus there was a presumption that his application should be rejected. However, assuming that defendant's conduct was "part of a continuing criminal ... enterprise" that factor has considerably less significance here than it might have concerning some other crime.
During argument in the trial court, defense counsel commented that, "Your Honor is aware that welfare cases are routinely put into PTI." The prosecutor did not comment on or deny that statement, nor did he respond to a similar observation in defendant's brief to this court that,
counsel for the State would be forced to concede that welfare cases are put into pre-trial intervention in Atlantic County on a regular basis. Thus the prosecutor's reliance on this guideline finds no support in actual practice, published *509 case law or anything else for that matter.[3]
After referring to Guideline 3(1)(2), the prosecutor essentially repeated the facts of the matter, noted that the defendant had not disclosed the $130,000 accident settlement or some other miscellaneous receipts, and said that those factors supported "the conclusion that the thefts actually charged in the indictment were intentional." As defense counsel noted in his answer to that letter, the "intentional" nature of defendant's actions is a "given"; had they not been intentional, they could hardly have been criminal.
The prosecutor characterized defendant's actions as "a conscious decision to `take' the public's money to finance his private life while pursuing his private vocational goals." That statement, seems to suggest something beyond defendant's attempt simply to support himself and his children while he struggled to complete his education. To the extent that it implies some degree of affluence or luxury, it is without foundation in the record.
Defense counsel then submitted additional material, with a request for reconsideration. Again, however, the prosecutor rejected the application. After acknowledging the representation that restitution would be made by defendant's family, the prosecutor actually seems to have treated the restitution representation as a negative factor, to be weighed against defendant. He speculated that "given the willingness of relatives to now loan him the money to make restitution, it may well be that this defendant could have chosen to ask for such a loan to help finance his medical school training." Thus, he concluded again that defendant was not justified in what he did and PTI should be rejected.
The prosecutor's suggestion is, to say the least, a non-sequitor. Today, defendant faces imminent disaster. Family members may well be willing to pay their last dollar to avoid that disaster. That does not mean that without a threat of criminal conviction hanging over defendant's head they would have been willing to make the same sacrifice.[4]
During argument in the trial court, the prosecutor inexplicably referred to defendant as living an "upper middle-class" lifestyle, "living a rather good lifestyle," and trying to "make life easier" for himself. He presented no basis for that description, nor did he answer the arguments of defense counsel who said that before defendant got into college,
he was unemployed, had a severe and painful back injury[,] that he got in the National Guard, and had two kids to support. When he announced to his family he was hopeful to become a doctor, they basically laughed at him.
In its decision, the trial court acknowledged that it should not overrule the judgment of the prosecutor unless there was a "patent and gross abuse of discretion." However, the court concluded that
This case begs, calls out for entry into the Pretrial Intervention Program.... This defendant has an honorable discharge from the Army, he was honorably resigned as a police officer. He put himself through undergraduate school at Stockton and medical school in New Jersey, while he had a debilitating back *510 injury. That's a phenomenal series of feats that this young man went through.
I can't conceive of why PTI should not be granted to this young man. To me, [the prosecutor's] ... refusal is Draconian in this case....
I just can't believe that this is not the case, the kind of case that cries out for PTI. If this young man is not accepted into the program, I am convinced that his medical career is going to be in jeopardy. There is no question about it.
The court subsequently issued an eight-page formal opinion further elaborating on its decision. In that opinion it catalogued the "compelling reasons" for defendant's admission to PTI, a list which bears repeating here:
A. Defendant's Military Service:
1. He was age 17 when he enlisted in the United States Army.
2. Defendant was a member of the United States Army Reserves and eventually attained the rank of sergeant in April of 1983.
3. In 1986, defendant received a prestigious slot to attend the United States Army Aviation School at Fort Rucker, Alabama. In order to attend, Defendant resigned from the Ventnor City Police Department.
4. Defendant earned the Army Certificate of Achievement in July of 1981.
5. Defendant became a drill sergeant in the U.S.A.R. in February of 1983 and received a letter of commendation from his commanding officer during the course of his training.
6. Defendant graduated from the Primary Leadership Development Course for Non-commissioned Officers in South Carolina on December 10, 1983.
7. In his Enlisted Evaluation Report dated September 13, 1986, defendant was noted as an N.C.O. of the highest caliber and was rated with a total of 82 points out of a possible 85 in categories including integrity, loyalty, moral courage, and self-discipline.
8. Defendant earned the Good Conduct Ribbon in the New Jersey National Guard in February of 1987.
9. Defendant was trusted enough by the government to be cleared and receive a SECRET clearance.
10. Defendant earned an honorable discharge from the N.J.A.R.N.G. in November of 1989.
B. Defendant's Education:
1. After finishing basic training, defendant returned to Atlantic County and finished high schoolreceiving his High School Diploma at age 19.
2. Defendant attended Stockton State College, beginning in 1989. Defendant graduated from Stockton in December of 1993, receiving a Bachelor of Science degree with high honors in Biology.
3. Defendant graduated from Stockton with a 3.8 cumulative GPA.
4. Defendant received a letter of commendation from the Dean of Natural Science at Stockton State College in June of 1990.
5. Defendant used student loans in order to finance his undergraduate and graduate educations.
6. Defendant was accepted into medical school in New Jersey in December of 1993.
7. Defendant was listed in Who's Who Among Students in American Universities and Colleges.
8. Defendant graduated from the University of Medicine and Dentistry of New Jersey with a medical degree in osteopathic medicine.
9. Defendant received a partial scholarship from the Atlantic County Medical Society to attend medical school.
10. Defendant also received a merit scholarship while in medical school.

*511 11. Defendant was a student member in the New Jersey Association of Osteopathic Physicians and Surgeons.
12. Defendant was also a student member of the American College of Osteopathic Emergency Physicians.
13. Defendant was recommended by the Assistant Dean of the medical school to become a student tutor in gross anatomy.
C. Defendant's Work History:
1. In the summer of 1984, defendant joined the Ventnor City Police Department.
2. Defendant graduated from the Atlantic County Police Academy in December of 1984.
3. Even while disabled from the debilitating car accident, defendant attempted to work as a dealer and slot attendant in an Atlantic City casino.
D. Mitigating Factors:
1. Defendant resigned from the Army Aviation School in order to live up to his New Jersey child custody arrangements.
2. Defendant was involved in a serious auto accident which continues to cause pain to the present day. As a result of the accident, defendant suffered numerous back injuries and was required to have a spinal fusion and several other back operations.
3. According to defendant, he attended medical school in New Jersey in order to maintain his relationship with his children.
4. Defendant was elected to the Undergraduate American Academy of Osteopathy.
5. Defendant is a single parent with two children.
6. If charges are pending, defendant's licensing is suspect.
7. If defendant is convicted, it is extremely likely he will not be licensed as physician. And even if defendant is eventually licensed, he likely will be uninsurable.
8. Defendant has agreed to pay full restitution upon acceptance into PTI.
9. The offense defendant is charged with is non-violent in nature.
10. Defendant received his certification for completion of a first Responder course in November of 1984.
11. Defendant was trained in basic life support and received certification in January of 1993.
12. According to the Program Director, defendant appears to maintain a close family relationship.
13. Defendant has no prior convictions and only one prior arrestfor shoplifting in 1996 which was dismissed on record in 1997.
14. Defendant is currently a resident at Atlantic City Medical Center.
15. If defendant goes to trial whether win or losehe will likely be dismissed from residency at A.C.M.C.
In both its opinions, the trial court commented on the striking parallel between this case and State v. Mickens, 236 N.J.Super. 272, 565 A.2d 720 (App.Div. 1989). I am also struck by that parallel, and I find the cogent language of Judge Pressler there to be equally applicable here.
In Mickens, a thirty-year-old single parent with three children and a high school education, "had managed to complete a secretarial course" and, while caring for her children, obtained a job at a rate of four to five dollars per hour. She did not report that income while she continued to receive welfare benefits because she "had trouble making ends meet." She was trying to move herself and her family out of what the court described as "a welfare facility well-qualified for the characterization of `undesirable'." Id. at 274, 565 A.2d 720. She managed to accomplish that move and also obtained a secretarial position with the Merrill Lynch brokerage firm where, after thirteen months, "she had done so well that her employer selected *512 her for attendance at its stockbroker school." Id. at 275, 565 A.2d 720.
At just about the time defendant was preparing to attend stockbroker school, she was indicted for welfare fraud involving the receipt of $15,000 over a three and one-half year period. She was told by her employer that if she was to become a stockbroker, she would have to be bonded and if she had a criminal record she could not be bonded. Id. at 274, 565 A.2d 720. She was also told that if she was convicted of welfare fraud, even her secretarial employment would be terminated. Id. at 275, 565 A.2d 720. She applied for PTI and the prosecutor rejected her application. Ibid. He concluded that defendant's actions constituted a "continuing involvement in criminal activity"; that defendant's reason for her actions ("making ends meet") did not constitute justification; that defendant could obtain alternate employment; and that her actions were "simply and succinctly a case of a defendant seeking to `pad' her income by illegal means." He found "no showing of compelling reasons" for admission to PTI and refused to reconsider his denial. Id. at 277-78, 565 A.2d 720.
On appeal, this court's decision referred to the trial court's "hesitant denial" of defendant's motion to compel admittance to PTI and concluded that,
[a]ssuming that Guideline 3(I)(2) applies, we are nevertheless persuaded that this defendant met the standards of "Amenability to the rehabilitative process" and "Compelling reasons justifying his admission" so overwhelmingly that the denial cannot be viewed as other than a patent and gross abuse of discretion.
[Id. at 278, 565 A.2d 720.]
The court noted that defendant had no prior criminal record of any kind, no history of substance abuse or psychological problem and, "as noted by the Program Director, `is sincerely sorry for what she has done'." Id. at 275, 565 A.2d 720. Defendant's presentation to the Program Director indicated that
she has never been in any trouble before; she has already caused enough embarrassment for herself and her family; she is the sole support of her three dependent children, she feels that she is now in a career position and that a conviction could cause her to lose her current employment and adversely affect future employment opportunity; she will never become involved in criminal activities in the future and she is willing to make full restitution....
[Ibid.]
In concluding that the prosecutor's rejection of the PTI application constituted a "patent and gross abuse of prosecutorial discretion," the court noted that "individualized evaluation is at the heart" of the PTI program. Id. at 277, 565 A.2d 720. It found that the prosecutor's decision was "a case of a clear error of judgment" which, under the standard of State v. DeMarco, supra, 107 N.J. at 567, 527 A.2d 417, warranted the court's directing defendant's admission to PTI. Given defendant's prior unblemished record and her singular accomplishments, the court concluded that PTI was particularly appropriate:
Under the circumstances here, defendant's crime is forgivable, and not to forgive it by her PTI admission makes a mockery of the rehabilitative purpose of PTI. Defendant will not only be deprived of the benefit of her fraudulently obtained welfare, but of the benefit of her own legitimate efforts. And so will her children. Her rehabilitation will be stopped dead in its tracks. She will lose her job, be eligible for welfare, and not be able to make any restitutiona net loss for her, her family, and society, with no offsetting gains we can perceive. If this defendant is not eligible for PTI, who is?.... PTI is premised on the recognition that the applicant has done something wrong, has made a mistake. The applicant need not have been driven to that conduct. He must, however, acknowledge his error, be sincerely remorseful, be willing to make amends for *513 it outside the criminal justice system, and have the capacity to do so.
[Id. at 278-79, 565 A.2d 720.]
The similarity between Mickens and this case is, as noted, striking. The defendant in Mickens attended a secretarial school while caring for her three children. Defendant here completed an exemplary period of army service and thereafter served as a police officer while also fulfilling a parental role. While Ms. Mickens "had a need to be rehabilitated from poverty, from the burdens of single parenthood, from the employment limitations of a high school education obtained in an urban ghetto, and from a housing market who's inadequacy for people like her constitutes a social economic and human crisis of national proportions," Id. at 278, 565 A.2d 720, defendant here had a rehabilitative need stemming from his lack of an education beyond high school, his single parenthood, and a serious, debilitating injury. While Ms. Mickens rehabilitated herself through her secretarial course and her diligent employment, Seyler did the same through his college and medical school attendance. While Mickens had an exemplary record, so too did Seyler. And just as Mickens did wrong and was undoubtedly guilty of the crime with which she was charged, so too did Seyler do wrong in his unwarranted receipt of welfare benefits.
In both cases, too, the anticipated new careers might well disappear. And just as denial of Mickens's admission to PTI made a "mockery of the rehabilitative purpose of PTI," that would also describe a rejection of Seyler's entry to PTI. The question asked in Mickens can also be asked here: "If this defendant is not eligible for PTI, who is?" See, Id. at 279, 565 A.2d 720.
I do not find persuasive either the prosecutor's attempts to distinguish Mickens or the observations of the majority concerning Mickens. The primary argument, referred to above, seems to be that Seyler maintained some form of upper middle-class living standard, that the welfare benefits he obtained were not really used just to maintain a modest level of support for himself and his children, and that defendant's actions bespeak some form of greed not present in Mickens. I find no basis for those conclusions.
The excess grants and scholarship aid which defendant received (beyond that which went for tuition), represented approximately $17,800 for each of three years. During each of those years defendant also obtained approximately $7,000 in welfare funds. Thus, the total he received, which covered support for himself and his children, was $22,000 per yearhardly enough to provide the comfortable or upper middle-class level the prosecutor portrays. Rather, the numbers are consistent with the picture presented by defendant, of himself and his daughter living in their "fixer upper" house, with defendant borrowing extensively on credit cards and from his family, and their maintaining a livable but far from affluent existence.
Other attempts to distinguish Mickens are equally unpersuasive. Obviously the defendant in Mickens had choices available to her, just as Brian Seyler had here. Just as obviously, both made the wrong choice. If it is true that Seyler made "a conscious decision to take the public's money to finance his private life while pursuing his private vocational goals," that statement is just as true of Ms. Mickens. If it is true that "defendant was presumably aware of the seriousness of his fraudulent conduct and the sanctions which could be imposed upon him if he were caught," it is difficult to believe that Ms. Mickens, described as a highly intelligent and competent woman, was unaware of those rather obvious propositions.
The concept of Ms. Mickens being somehow driven unavoidably to criminal action, while Seyler was a free agent who made a selfish, anti-social and apparently unforgivable decision, is simply untenable. The factors which drove a previously law abiding, conscientious and hard-working citizen to commit welfare fraud may be different *514 in each case. But in each those factors were present, they were real, and, to both defendants, they apparently seemed overwhelming. While the majority refers to Seyler as a "college graduate with a substantial employment history who undoubtedly could have obtained employment to support himself and his family, but instead elected to attend medical school," that comment overlooks the undisputed significance of the major accident which terminated Seyler's police and military career. The report provided by the court's Case Management Office says that defendant,
has been generally unemployed for the past ten years due to injuries sustained in the previously mentioned motor vehicle accident. He stated that he attempted to secure employment as a dealer and a slot attendant in the casino industry, however his medical condition worsened, and he was forced to leave those short-lived positions.
Since his prior record with the Ventnor City Police Department and the United States Army were in all respects exemplary (and often outstanding) there is no reason to question the stated reason for his later unemployment. While it is undoubtedly true that defendant could have postponed medical school, it is probably also true that Ms. Mickens could have obtained some kind of second job to make "ends meet." However, just as that theoretical alternative was probably not realistically available to Ms. Mickens, so too a postponement of medical school or college for someone who had two children and was twenty-seven years old when he began college and thirty-two when he began medical school, probably did not represent a realistic course of action.
The essence of the Mickens holding is contained in one terse but compelling sentence: "Under the circumstances here, defendant's crime is forgivable, and not to forgive it by her PTI admission makes a mockery of the rehabilitative purpose of PTI." Those words are every bit as applicable here, to Brian Seyler, as they were there to Lorraine Mickens.
I note also that in stating his reasons for rejecting defendant's admission to PTI, the prosecutor has submitted what amounts to a count of the number of misstatements made by defendant in connection with his wrongful obtaining of welfare benefits. The majority repeats that counting process, quoting one statement by the prosecutor that refers to "six separate acts of unsworn certification" and, at another point, referring to eleven misstatements.
The number of such statements, I believe, is immaterial. The fact is that all of defendant's unlawful acts took place within a finite period of time, under the circumstances described above, and all were part of the same series of related acts. To suggest that defendant's signature on a particular application form in some way constituted one offense, while a similar signature on a related application represented a separate or additional offense, is unrealistic. Implying that the number of such certifications bears in some way on the degree of defendant's guilt is misleading.
Nor is the dollar volume here a rational basis to distinguish this case from Mickens. In Mickens, defendant improperly obtained $15,730.00 over approximately three and one half years, between July 1981 and March 1985. Here, Seyler improperly obtained $22,824.00 between January 1992 and April 1997. That indicates a smaller annual amount than that involved in Mickens, and, considering the inflationary trend between the early 1980's and the early to mid 1990's, the total involved is not significantly different. It certainly does not represent a valid basis for differential treatment in the two cases.
The prosecutor also notes that defendant was arrested for shoplifting in 1996, although the charge was subsequently dismissed. The record is devoid of any explanation or any details of the matter. What the alleged shoplifting consisted of, why it was dismissed or any other salient factors *515 are omitted. Certainly if the prosecutor regarded that issue as significant in resolution of the PTI application, one would expect a fuller exploration of the point. In fact, the point was not mentioned in any of the communications from the prosecutor, including the two lengthy letters in which he rejected defense counsel's application and in the prosecutor's argument before the trial court. So far as I can determine, the point is raised for the first time in the brief to this court.
In addition, the prosecutor argues that defendant's prospects for rehabilitation are not good and that his expressions of remorse are insincere. Again, I find no basis for those conclusions. But for the offense for which he was indicted, defendant's record in the Army, in his employment as a police officer, through four years of college and four years of medical school, shows no antisocial behavior, no crime, no dishonesty, but in fact show a remarkable dedication to his parental obligations and the diligent and impressive performance of his duties. If it is not aborted now, defendant's likely career as a physician should make him a productive, contributing member of society. There is no reason to doubt his expressions of remorse, his claim that he has never before done anything like this, and his promise that he will never do anything like it again.[5]
I recognize, of course, the "enhanced deference" or "extra deference" to be extended to a prosecutor in determining whether to admit or reject a candidate for PTI. State v. Wallace, 146 N.J. 576, 589, 684 A.2d 1355 (1996). The decision is usually one to be made by the prosecutor and the court should normally not inject itself into the process. It certainly should not overrule a prosecutorial determination simply because the court would have decided the matter differently. Id. at 582, 589, 684 A.2d 1355. Only in the event of a "patent and gross abuse of discretion" should the court order a defendant's admission to PTI over the objection of the prosecutor. Id. at 582, 684 A.2d 1355. See also, generally, State v. Nwobu, 139 N.J. 236, 652 A.2d 1209 (1995).
Nevertheless, the prosecutor's discretion is not "unbridled" and the judiciary retains a role in the PTI process:
[I]t remains the obligation of the judiciary to check those instances where the prosecutor has so inappropriately weighted the various considerations so as to constitute a "clear error in judgment."
[State v. Wallace, supra, 146 N.J. at 586, 684 A.2d 1355.]
The court's conclusion in Mickens was that the prosecutor had committed just such a "clear error in judgment." I reach the same conclusion here. I share the trial court's opinion that this is "the type of case that PTI was designed for." Admission to PTI can accomplish all of the ends envisioned by that program. It can provide a second chance for someone whose past conduct has earned it. It can provide an opportunity to create a useful, productive life, not only for defendant himself but also for his children and for society.
On the other hand, the rejection of PTI will likely mean an end to that potentially productive career. It may well mean a life in which defendant and his children will continue to be eligible for welfare or, at the very least, will live a life and make a contribution substantially short of what they might otherwise do. To say that the penalty which would be visited upon defendant would outweigh the severity of his crime, would be an understatement.
*516 Finally, I note that in Wallace, where the Supreme Court pointed out that there remain cases where courts should properly overrule determinations by prosecutors, one of the examples cited for such judicial action is State v. Mickens. The Court described that decision as "ordering PTI admission for a single mother of three young children charged with welfare fraud where the woman would lose her job if convicted and the woman was willing to make full restitution." Wallace, supra, 146 N.J. at 586, 684 A.2d 1355. Without significant change, that quotation describes this case. Just as the court found in Mickens (with the apparent subsequent approval of the Supreme Court), I conclude that the prosecutor's rejection of defendant's request for admission to PTI was a gross abuse of discretion and constituted "a clear error in judgment." Accordingly, I would affirm the determination of the trial court, substantially for the reasons expressed by Judge Guerrera in his oral opinion of July 17, 1998, as well as his written opinion of July 29, 1998, together with the additional reasons set out above.
NOTES
[1] Although the dissent states that the PTI Manager recommended that defendant be admitted into PTI (dissenting op. at 378, 733 A.2d at 508), we note that her report concludes with the following statement: "Based upon the potential substantial injury that Seyler may suffer if rejected from PTI, deference is being given to the prosecutor to determine the appropriate disposition in this matter."
[2] The dissent suggests that defendant undertook to make such a showing in this case (dissenting op. at 379, 733 A.2d at 508). However, defendant did not present any evidence regarding the Atlantic County Prosecutor's policy or practice in consenting to PTI applications by defendants charged with welfare fraud. Defendant's only reference to this subject was the following statement during his attorney's oral argument:

Your Honor is aware that welfare cases are routinely put into PTI; and, in fact, there's an Appellate Division case where Judge Pressler said that these types of cases were ready-made for a PTI disposition.
Clearly, this statement does not focus upon the policies of the Atlantic County Prosecutor's Office. Instead, it seems to assume that our opinion in State v. Mickens, 236 N.J.Super. 272, 565 A.2d 720 (App.Div.1989) established some kind of presumption in favor of admission into PTI of persons charged with welfare fraud.
In any event, Sutton imposes an extremely heavy burden upon a defendant who undertakes to demonstrate that rejection of a PTI application constituted a patent and gross abuse of discretion because the prosecutor accorded him or her less favorable treatment than other identically situated defendants:
[I]n order for a defendant to prevail on such a theory, he will truly be required to carry a heavy burden.... [P]rosecutorial decisions in PTI matters are primarily individualistic in nature. In making any determination, the prosecutor must assess a particular applicant's "amenability to correction" and potential "responsiveness to rehabilitation"assessments which are dependent upon such factors as a defendant's age, past criminal record, education, family ties, standing in the community, and employment performance. Also relevant are "subjective" evaluations, such as the prosecutor's assessment of a particular defendant's sincerity, the motive underlying the commission of the crime, and the degree of local public anxiety attaching to certain forms of misconduct. Different results may therefore be reached in superficially similar cases.
Ordinarily, therefore, a defendant will not prevail merely because he can demonstrate that, unlike himself, others who have been charged with similar offenses have been diverted into PTI. Rather, he is required to demonstrate through independent evidence that the prosecutor's refusal to sanction his admission was in fact premised upon the consideration of an irrelevant or inappropriate factor.
[80 N.J. at 119-20, 402 A.2d 230 (citations omitted).]
Therefore, even if defendant's broad general representations concerning the disposition of PTI applications by other defendants charged with welfare fraud were supported by the record, this would not establish that the prosecutor's rejection of his application was "premised upon the consideration of an irrelevant or inappropriate factor." Id. at 120, 402 A.2d 230.
[3] N.J.S.A. 44:10-4(a) then required a person receiving AFDC benefits to execute a written agreement to repay benefits from any recovery in a personal injury action and imposed a lien to enforce this obligation. The prosecutor's investigatory report quoted on p. 364, 733 A.2d at 499 of this opinion indicates that defendant executed a repayment agreement in connection with his personal injury action but failed to report the settlement to the county welfare board.

In addition, as the prosecutor noted in his statement of reasons for the denial of defendant's PTI application, the administrative regulations governing the AFDC program require an applicant for assistance to make broad disclosure of both income and assets. The prosecutor's investigatory report indicates that defendant may have failed to comply with these obligations when he reapplied for assistance in 1992.
Although the record before us is insufficient to determine whether defendant committed violations of the statutes and regulations governing the AFDC program in 1990 and 1992, the Credentials Committee may consider this to be an appropriate subject of inquiry in determining the period of time during which defendant engaged in welfare fraud.
[1] Counsel did not contend that the welfare officers knew the grants exceeded tuition expense, and that defendant was therefore ineligible for welfare benefits.
[2] The majority correctly notes that rejection by the Credentials Committee is not a certainty and it is possible that defendant may obtain a license to practice medicine notwithstanding a criminal conviction. However, the majority says nothing of Dr. Grossman's description of the problems respecting acceptance by training programs and HMO's which, together with the licensing issue, are described by him as creating "strike number three in this very difficult situation."
[3] Contrary to the majority's statement (majority op., footnote 2), I do not suggest that defendant undertook to demonstrate a case of differential treatment which, by itself, would warrant admission to PTI under State v. Sutton, 80 N.J. 110, 117-18, 402 A.2d 230 (1979). I point out this apparently undenied policy in Atlantic County simply to note that describing defendant's conduct as "part of a continuing criminal .... enterprise" is somewhat less than realistic and certainly should not be of any great significance in deciding this case.
[4] In defendant's brief on appeal, counsel says that the funds have now actually been advanced by defendant's fiancee, who "basically withdrew her life's savings and offered them up on behalf of the County of Atlantic."
[5] The prosecutor refers to an almost passing comment by defendant that he thought at least one of his welfare advisors had known, or had made an effort not to know, that defendant was receiving benefits to which he was not entitled. Whether or not that was true, I do not interpret defendant's comments as attempting to justify his otherwise clearly acknowledged criminal actions. He did not present that statement as constituting any such justification, and I do not believe that the reference undercuts his compelling showing of remorse and likely rehabilitation.