RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0611-15T3

STATE OF NEW JERSEY,

 Plaintiff-Appellant,

v.

BRANDON J. GILL,

 Defendant-Respondent.

________________________________

 Argued February 6, 2017 – Decided September 8, 2017

 Before Judges Sabatino, Nugent and Currier.

 On appeal from Superior Court of New Jersey,
 Law Division, Middlesex County, Indictment No.
 14-07-0807.

 Brian D. Gillet, Deputy First Assistant
 Prosecutor, argued the cause for appellant
 (Andrew C. Carey, Middlesex County Prosecutor,
 attorney; Mr. Gillet, of counsel and on the
 brief).

 David R. Oakley argued the cause for
 respondent (Anderl & Oakley, PC, attorneys;
 Mr. Oakley, of counsel and on the brief).

PER CURIAM

 The State appeals from a September 29, 2015 order denying its

motion for reconsideration. The State had asked the trial court
to reconsider its decision granting defendant's motion to be

admitted into the Pretrial Intervention Program (PTI) over the

State's objection. For the reasons that follow, we reverse and

remand for further consideration — by the prosecutor in the first

instance — the PTI decision concerning defendant.

 These are the facts. Defendant, a Florida resident,

established a virtual relationship with a New York City resident

(his "girlfriend").1 The duration of their relationship is

unclear, however, their exchange of text messages indicates the

one-year anniversary of their first online meeting was approaching

in April 2014. In anticipation of their anniversary, defendant

and his girlfriend planned to meet in person.

 Their March 2014 text message exchanges demonstrate defendant

and his girlfriend were enamored with one another. Defendant's

girlfriend was looking forward to their in-person meeting as much

as defendant. In fact, as late as the night of April 22, 2014,

she exchanged amorous, intimate text messages with defendant. That

changed the morning of April 23, 2014, the day before defendant

left for their in-person meeting.

1
 The record is not entirely clear, but defendant and his
girlfriend might have communicated by phone as well as by text
messages.

 2 A-0611-15T3
 That morning, though defendant's girlfriend professed she

missed him, she revealed she had been at a party where she talked

and danced with another man. The other man laughed when she said

she had a boyfriend. During a dance, the man groped her and pinned

her against a wall. In a text message to defendant, his girlfriend

said she did not push the other man off when he touched her. She

also said she was drunk and did not remember the incident.

 Defendant's responsive text messages reveal he was angry

about what had occurred between his girlfriend and the other man.

Defendant believed the other man had no respect for defendant's

relationship. Defendant's girlfriend texted defendant that she

would tell the other man to back off when she saw him later. The

text message exchange then reverted to amorous professions.

 Later that afternoon, defendant's girlfriend disclosed in a

text message she had kissed the other man. Although she insisted

"it was the liquor," defendant texted her, "I don't want you

talking to him, hang[ing] around him, [texting] him, or none of

that cause that shit just crossed the line right there."

Defendant's girlfriend thought defendant was overreacting,

repeating "it was the liquor." Defendant replied: "Lucky I'm not

there to fuck his ass up and you know I'll do it if I see his

trifflin ass."

 3 A-0611-15T3
 Defendant said he would "let it go" because he was "not going

to let [it] mess up" his day or time together with his girlfriend.

He apologized for overreacting and accepted his girlfriend's

explanation that "it was the liquor."

 Defendant's girlfriend went to the other man's house on the

afternoon of April 23, 2014, where they shared pizza and watched

a movie. When she returned home, she exchanged many text messages

with defendant. In some, the virtual couple professed their love

for one another, but the focus of the exchanges returned to

defendant's girlfriend's interaction with the other man.

 Then, late on the night of April 23, after defendant had

packed for the drive to New York, his girlfriend became angry

about something he posted on Facebook. The content is not clear

from their text message exchange. Her anger escalated, however,

because she believed the Facebook content was an attempt to make

her look stupid. She told defendant to leave her alone. She said

repeatedly it was not the first time he had done things to make

her look stupid to his friends.

 On the morning of April 24, 2014, as defendant prepared to

leave for New York, he asked his girlfriend for her address. She

texted him to forget it and to have fun, a message she repeated

several times. Although she never provided her address, defendant

drove to New York. As defendant drove up the East Coast, he

 4 A-0611-15T3
continued to text his girlfriend in anticipation of meeting her.

The content and tone of the messages was that he loved her and

would not let anything prevent him from meeting her. Defendant's

girlfriend mostly ignored his text messages. She made it clear,

however, she did not want to spend time with him.

 When defendant was approximately two hours from New York, he

texted his girlfriend and asked if he could stay with her because

he had no place to go. She replied he should put that message on

his Facebook to see what his friends thought about it. Later that

night, at 10:50 p.m., defendant told his girlfriend he was at

Central Park and asked if they could meet. By 1:05 a.m. on April

25, 2014, defendant still had not heard from his girlfriend, and

he told her he would be sleeping in his car.

 At approximately 6:58 a.m. on April 25, defendant's

girlfriend finally texted defendant and asked where he was.

Defendant responded he was in Jersey City, and again requested to

see her. She refused, declining to provide defendant her home or

school address. At 7:14 p.m. on April 25, defendant texted his

girlfriend he was at the South Brunswick Police Station "getting

locked up." The following day, at 5:48 a.m., he explained to her

in a text message: "I had a gun [in] my car and I wasn't aware of

the gun laws in Jersey so I told them what I had and they searched

my car [and] didn't find anything."

 5 A-0611-15T3
 According to the arresting officer's investigation report,

on April 25, 2014, at approximately 2:56 p.m., he was dispatched

to a shopping center to investigate a suspicious vehicle that had

been parked for eight hours with its engine running. He and

another officer approached the vehicle, asked the driver for his

credentials, and identified the driver as defendant. Defendant

told the officers he left Florida the day before to meet friends

in New York City, arriving at 3:00 a.m. after traveling the entire

day. Defendant stated after meeting his friends, he left New York

City at 5:00 a.m. to travel home.

 The officers found defendant's story suspicious, and noticed

defendant became increasingly nervous as their interaction

continued. They requested defendant step out of his vehicle, and

as defendant did so, one of the officers asked whether defendant

had weapons in his possession. Defendant replied he had a "'Glock

9MM' handgun in his glove compartment along with an extra loaded

magazine, a collapsible baton, and a knife." The police secured

the weapons, uncovering the fully loaded handgun and an additional

magazine, both containing hollow-point ammunition, the baton, and

the knife. The officers placed defendant under arrest and took

him to the police station.

 The next day, on April 26, 2014, at 1:13 a.m., defendant told

his girlfriend his friend bailed him out of jail, and again asked

 6 A-0611-15T3
whether they could meet. At 5:30 a.m., defendant's girlfriend

finally told defendant "this is so over" and to go home. Defendant

replied he had a court appearance in a few days and wished to stay

with her until then. Defendant's girlfriend refused to see him,

telling defendant to return home.

 Following defendant's arrest, a Middlesex County grand jury

returned an indictment charging him with second-degree unlawful

possession of a handgun, N.J.S.A. 2C:39-5(b), and fourth-degree

possession of a prohibited device, hollow-point ammunition,

N.J.S.A. 2C:39-3(f). Defendant applied for admission into PTI in

October 2014. As part of his application, he submitted character

letters from his parents, his pastor, and people in his community;

proof of his private employment and service with some distinction

in the United States Army Reserve; and the text messages between

himself and his online girlfriend. Additionally, defendant

submitted a letter from a friend who stated he gave the handgun

to defendant as a gift in 2013.

 The Middlesex County Criminal Case Manager (CCM) recommended

the denial of defendant’s application. Defendant provided the

prosecutor with additional information in December 2014, and

January and February 2015. The information included an expert's

report citing Florida statutes authorizing the transport of

handguns in a vehicle’s glove compartment and possession of hollow

 7 A-0611-15T3
point bullets. On February 18, 2015, an assistant prosecutor

rejected defendant’s PTI application. Defendant appealed.

 On appeal, the trial court found the State’s rejection letter

"conclusory" and determined the State should have considered the

Attorney General's 2014 guidelines with respect to out-of-state

weapons offenders. The court remanded the matter to the

prosecutor, directing the prosecutor "reference each factor and

each fact that relates to that factor so that [the] [c]ourt [could]

understand the State's reasoning and not just its conclusions."

 On April 13, 2015, the prosecutor filed its second rejection

letter, analyzing all seventeen criteria set forth in N.J.S.A.

2C:42-12(e) as they pertained to defendant's case. The prosecutor

also considered the Attorney General's 2014 guidelines in its

second rejection letter. Thereafter, the trial court issued a

written opinion admitting defendant into PTI over the State's

objection.

 Following defendant's entry into PTI, the State moved for

reconsideration of the trial court's decision. The court denied

the State's motion in an oral decision, finding the State presented

"no new facts" in its application. The State now appeals the

trial court's decision admitting defendant into PTI, raising the

following argument:

 8 A-0611-15T3
 POINT I

 THE TRIAL COURT ABUSED ITS DISCRETION BY
 ADMITTING DEFENDANT INTO PTI OVER THE STATE’S
 OBJECTION, BECAUSE DEFENDANT FAILED TO SHOW
 THAT THE PROSECUTOR’S REJECTION AMOUNTED TO A
 PATENT AND GROSS ABUSE OF DISCRETION. THE
 STATE PROPERLY CONSIDERED THE 2014 AG'S
 CLARIFICATION IN MAKING THAT DECISION.

 The criteria for admission into PTI, as well as the procedures

concerning the program, are set forth in N.J.S.A. 2C:43-12 to -22

and Rule 3:28. The Legislature's declaration of public policy

underlying PTI is found in N.J.S.A. 2C:43-12(a) and summarized in

Rule 3:28, Guideline 1. "Eligibility for PTI is broad enough to

include all defendants who demonstrate sufficient effort to effect

necessary behavioral change and show that future criminal behavior

will not occur." R. 3:28, Guideline 2. Importantly, "[e]ach

applicant for supervisory treatment shall be entitled to full and

fair consideration of his application." N.J.S.A. 2C:43-12(f).

When prosecutors and program directors decide whether to recommend

a defendant for PTI, they are required to consider, among others,

the factors enumerated in N.J.S.A. 2C:43-12(e)(1) through (17).

 Our review of a prosecutor's decision to deny a defendant

admission into PTI is "severely limited." State v. Negran, 178

N.J. 73, 82 (2003) (citations omitted). Judicial review of a PTI

application exists "to check only the most egregious examples of

injustice and unfairness." State v. Nwobu, 139 N.J. 236, 246

 9 A-0611-15T3
(1995) (quoting State v. Kraft, 265 N.J. Super. 106, 111 (App.

Div. 1993)). Absent evidence to the contrary, a reviewing court

must assume that "the prosecutor's office has considered all

relevant factors in reaching the PTI decision." Id. at 249 (citing

State v. Dalglish, 86 N.J. 503, 509 (1981)).

 Nonetheless, "[i]f a defendant can 'clearly and convincingly

establish that the prosecutor's refusal to sanction admission into

the program was based on a patent and gross abuse of . . .

discretion,' . . . a reviewing court may overrule the prosecutor

and order a defendant admitted to PTI." State v. Wallace, 146

N.J. 576, 582 (1996) (first alteration in original) (quoting State

v. Leonardis, 73 N.J. 360, 382 (1977)). Generally, a defendant

can establish a prosecutor has abused his or her discretion by

showing:

 that a prosecutorial veto (a) was not premised
 upon a consideration of all relevant factors,
 (b) was based upon a consideration of
 irrelevant or inappropriate factors, or (c)
 amounted to a clear error in judgment. . . .
 In order for such an abuse of discretion to
 rise to the level of 'patent and gross,' it
 must further be shown that the prosecutorial
 error complained of will clearly subvert the
 goals underlying Pretrial Intervention.

 [Id. at 583 (citations omitted).]

 Additionally, if a "reviewing court determines that the

'prosecutor's decision was arbitrary, irrational, or otherwise an

 10 A-0611-15T3
abuse of discretion, but not a patent and gross abuse' of

discretion, the reviewing court may remand to the prosecutor for

further consideration." State v. K.S., 220 N.J. 190, 200 (2015)

(quoting Dalglish, supra, 86 N.J. at 509). Thus, if a prosecutor

does not consider factors that should be considered, or does

consider factors that should not be considered, a remand is

appropriate. Ibid. "A remand to the prosecutor affords an

opportunity to apply the standards set forth by the court 'without

supplanting the prosecutor's primacy in determining whether

[Pretrial Intervention] is appropriate in individual cases.'"

Ibid. (alteration in original) (citation omitted).

 Here, we agree with the trial court that the prosecutor

considered factors that should not have been considered in the

rejection of defendant's PTI application. We disagree, however,

with the trial court's remedy, namely, admitting defendant into

PTI over the prosecutor's objection. Rather, we conclude the

prosecutor's reliance on inappropriate factors constituted an

abuse of discretion but not a patent abuse of discretion. For

that reason, we remand to afford the prosecutor the opportunity

to apply the applicable standards without supplanting the

prosecutor's primacy in determining whether PTI is appropriate.

 In the second letter explaining the decision not to admit

defendant into PTI, after detailing the facts in defendant's email

 11 A-0611-15T3
exchanges and the arresting officer's report — with emphasis on

defendant's threats concerning the other man his girlfriend was

seeing — the assistant prosecutor reviewed each of the required

statutory criteria. She noted the rebuttable presumption against

admitting defendants charged with second-degree crimes into PTI,

Rule 3:28, Guideline 3(i), and rejected the notion defendant had

shown compelling reasons to overcome the presumption.

 One theme of the assistant prosecutor's decision — which she

repeated and emphasized throughout her letter — was that before

leaving Florida, defendant loaded the gun and ammunition into his

car. The assistant prosecutor also repeatedly asserted that

defendant's nervousness, shaking hands, and evasive answers when

confronted by police in the parking lot "strongly show he knew

that he [did not] have the misimpression that the gun was lawfully

being possessed by him and also clearly makes suspect his motive

for having [the] weapons." The assistant prosecutor stressed

defendant "previously worked for a security company and is in the

military. Both occupations have rules and regulations regarding

firearms and the need to know and comply with them." The assistant

prosecutor declared "there is no way . . . defendant believed

honestly that his possession under those circumstances was lawful,

given his age, his prior military experience, and security job

experience."

 12 A-0611-15T3
 The assistant prosecutor also addressed the Attorney

General's September 24, 2014 letter regarding "Clarification of

'Graves Act' 2008 Directive with Respect to Offenses Committed by

Out-of-State Visitors From States Where Their Gun-Possession

Conduct Would Have Been Lawful" ("Clarification"). The

Clarification applies to Graves Act cases where the defendant is

an out-of-state resident who produces proof that: 1) the firearm

had been lawfully acquired in another jurisdiction, 2) defendant's

possession would have been lawful in his or her home jurisdiction,

and 3) defendant was under the misimpression that such possession

was lawful in New Jersey.

 The assistant prosecutor acknowledged defendant produced

proofs the handgun was obtained lawfully and his possession of it

would have been lawful in his home jurisdiction. She did not

feel, however, defendant satisfied the third criteria, namely, he

was under the misimpression that such possession was lawful in New

Jersey. She found "clear evidence to the contrary" – defendant

did not immediately volunteer to the police that he had a gun in

the glove compartment; defendant's "nervousness and evasive

answers strongly show he knew that he [did not] have the

misimpression that the gun was being lawfully possessed by him and

also clearly makes suspect his motive for having these weapons";

and "[i]t was only after [the police] asked [defendant] out of the

 13 A-0611-15T3
vehicle and asked him if there were any weapons in there that he

told them there were."

 The trial court issued a written opinion rejecting the State's

reasoning and ordered defendant be admitted into PTI. After

recounting the facts, setting forth the procedural history, and

citing controlling precedent, the court concluded "this is one of

those rare cases that require reversal because the prosecutor has

so inappropriately weighed the relevant factors that the decision

amounts to a 'patent and gross abuse of discretion.'" The court

noted it was viewing the State's reasons "through the lens of the

Attorney General's [Clarification]."

 The court began:

 While the prosecutor is not required to
 accept the defendant's explanation given in
 furtherance of a PTI application, neither is
 the prosecutor free to assume facts not found
 in the record to justify the [S]tate's PTI
 rejection. The April 13, 2015 rejection
 letter repeatedly assumes that the defendant
 specifically loaded the gun and ammunition
 into the glove compartment as part of his
 preparations for his trip to New York City.
 The State also implies that the defendant took
 the gun and ammunition as a direct consequence
 of and in response to the text messages about
 [the girlfriend's] revelations of her
 interactions with another man. There is
 nothing in the record to give credence to
 these assumptions by the State. It is just
 as likely that the gun and ammunition were
 always kept in the glove compartment and were
 not put in the car as part of preparation for
 this trip. In fact, at no time during the

 14 A-0611-15T3
 prolonged text exchanges between [defendant]
 and [his girlfriend] after [his girlfriend's]
 rejection did threats of violence occur.
 There were only the plaintive supplications
 of a lovesick and disappointed suitor
 interspaced with an accusation expression of
 anger. Thus, the State's rejection letter
 completely mischaracterized the defendant's
 motivation. The State, in describing the
 nature of the offense, also refers to the
 knife and baton in the glove compartment. In
 fact, the defendant was never charged with any
 crime that related to the presence of these
 items nor is there any suggestion that the
 possession of these items was in any way
 unlawful.

 Concerning the assistant prosecutor's assertion that

defendant's prior employment as a security guard and current

military service "somehow indicat[ed] . . . defendant should have

known about the restrictions of New Jersey's gun laws," the court

explained:

 This statement, in addition to having no basis
 in the record, demonstrates a complete
 inability or unwillingness to consider this
 case in light of the Attorney General's
 September 24, 2014 memorandum. The very
 thrust of that memorandum is that cases, such
 as this one, which primarily arise due to an
 out-of-state defendant's lack of familiarity
 with the strictures of New Jersey's gun laws,
 should be fairly considered for PTI as they
 fall outside the "heartland" of cases that are
 subject to the Graves Act. To state that being
 employed as a security guard in Florida or as
 an Army Reservist based in Florida somehow
 causes one to be charged with special
 knowledge of New Jersey's gun laws is
 inexplicable and in no way represents a

 15 A-0611-15T3
 logical and considered analysis of this
 defendant's PTI application.

 Similarly, the court noted that when discussing "the

assaultive or violent nature of the crime," the assistant

prosecutor "again makes assumptions that are prejudicial to the

defendant and, more importantly, not supported by any evidence."

The court continued: "[t]he State simply contends that the

defendant consciously loaded his gun for the purpose of going to

New York to seek out his rival for the affections of [his

girlfriend]. The State characterizes the defendant and his conduct

as 'obvious[ly] jealous, obsessive, [and] vindictive.'"

(Alterations in original). The court determined "[t]he facts do

not in any way provide any support for these assertions."

 After pointing out other assertions by the assistant

prosecutor that the court found unsupported by the record, the

trial court stated:

 This lack of thoughtful and reasoned
 consideration throughout the prosecutor's
 rejection letter amounts to a patent and gross
 abuse of discretion. Even after a remand by
 the court, the State has only set forth
 conclusions and assertions unsupported by the
 record. Even the initial program rejection
 did not attribute any of the nefarious conduct
 or motive to the defendant that appears for
 the first time in the rejection letter. The
 program describes [defendant] as a "family-
 oriented individual who has led a law abiding
 life for a substantial period of time."
 Without any seeming basis in fact, the State

 16 A-0611-15T3
 seeks to paint a far more sinister portrait
 to justify its rejection of this defendant for
 PTI.

 The court opined "defendant and the facts of this case fit

squarely into the four corners of [the Attorney General's

Clarification]." The court found defendant to be a law abiding

citizen of Florida who stopped while driving through New Jersey

to rest and get needed sleep, and defendant's possession of the

handgun and ammunition were lawful in his home state. The court

noted the letter from the person who gave defendant the gun as a

gift. The court also noted defendant's "text messages at the time

of his arrest clearly demonstrated . . . he had no idea that his

possession was unlawful in New Jersey." The court explained that

while stopping in a parking lot "was not as fleeting a contact as

merely transiting the [S]tate on an interstate highway, it was no

greater contact than stopping at a Turnpike rest area while passing

through." According to the court, the gun "was always in the

glove compartment in a holster. There is no indication that the

defendant ever planned to remove the gun from the holster or the

glove compartment. This offense was aberrational and isolated."

 Explaining it was "undisputed that the defendant was in fact

a productive and law abiding member of society, serving his country

in a commendable manner," the court concluded:

 17 A-0611-15T3
 If the case at bar is not the case contemplated
 for PTI enrollment both with an appropriate
 weighing of the statutory factors, so as not
 to engage in a patent and gross abuse of
 discretion, and under the special factors set
 forth in the Attorney General's
 [Clarification], then it is virtually
 impossible to contemplate what set of facts
 would constitute an appropriate case for
 enrollment.

 We agree with the trial court that the assistant prosecutor's

determination was based in large part on inappropriate and

speculative factors. For example, one of the primary

considerations for the assistant prosecutor's refusal to admit

defendant into PTI was that he deliberately loaded his gun and

ammunition into his glove compartment before leaving Florida,

after having recently made threats against the other man his

girlfriend had seen. As the trial court correctly pointed out,

there is no factual evidence in the record to support this

speculation. Rather, the evidence established defendant was given

the gun as a gift and that it was legal in Florida to carry a gun

and ammunition in a glove compartment.2

 Equally speculative is the assistant prosecutor's statement

that defendant's previous employment as a security guard and

current military service somehow make him knowledgeable about gun

2
 The assistant prosecutor conceded these facts in her second
letter denying defendant's admission into PTI. The State has not
cited any Florida precedent to the contrary.

 18 A-0611-15T3
laws in New Jersey and, by extension, knowledgeable about the gun

laws in every state. The assistant prosecutor cited no employment

regulations or manuals, or military regulations or manuals, from

which defendant should have derived such knowledge.

 The assistant prosecutor's third thematic assumption – that

defendant's nervousness and shaking hands constitute strong

evidence that he knew possession of the gun in his glove

compartment was illegal – is also suspect. According to the police

report, which is part of the appellate record, defendant was a

twenty-five year old African American at the time of his arrest.

One could just as readily speculate that when confronted by police

in a faraway state, for doing nothing more than apparently sleeping

in a parking lot, a young black man might become nervous. His

hands might even shake.

 These were not the only instances of unfounded suppositions

made by the assistant prosecutor. Other statements by the

assistant prosecutor also raise concerns about whether she fairly

considered placing defendant into PTI. For example, on page four

of her letter, after asserting defendant posted a retaliatory

"something" on Facebook and his girlfriend thereafter refused to

give him her address, the assistant prosecutor stated defendant

"loaded his gun, took along extra ammo, a collapsible baton and

knife and left Florida to go to New York via other states as well

 19 A-0611-15T3
as New Jersey." After reiterating defendant drove through "the

remaining states" with his loaded gun not knowing where his

girlfriend lived, and then parked for eight hours in a shopping

center in New Jersey, the assistant prosecutor stated: "Not only

does this indicate an existence of a personal problem, but a

certain character trait that relates to his ego and need to carry

weapons which were presumably for a pure social visit . . . which

he refused to believe or accept . . . was cancelled." The assistant

prosecutor has cited no authority for the psychology underlying

her assertions about character trait, ego and the need to carry

weapons.

 In any event, it is readily apparent the assistant prosecutor

made a decision "based upon a consideration of irrelevant or

inappropriate factors," Wallace, supra, 146 N.J. at 583, thus

calling into serious question whether defendant received "full and

fair consideration of his application." N.J.S.A. 2C:43-12(f). We

therefore conclude the assistant prosecutor abused her discretion

with respect to the reasons she cited in her decision.

 Having said that, we disagree with the trial court that the

prosecutor's abuse of discretion was patent and gross, or that the

remedy must be admission into PTI. We reach this conclusion for

several reasons. First and foremost, defendant was charged with

a second-degree offense and was presumptively ineligible for PTI.

 20 A-0611-15T3
Defendant was thus required to demonstrate compelling reasons to

overcome the presumption. In addition, there are many factors in

this case that, when objectively weighed and balanced, could tip

the scale in either direction. For example, in evaluating whether,

under the Attorney General's Clarification, there was minimal

exposure of the firearm to persons in New Jersey, the evidence

appears to indicate defendant kept the gun and ammunition in his

vehicle at all times and did not carry the gun on his person

outside the vehicle. Moreover, defendant's travel in New Jersey

was transitory, although he admittedly did stop to sleep.

 On the other hand, the handgun was loaded and defendant kept

it in the glove compartment rather than in the trunk. Defendant's

failure to explain why the loaded gun and extra ammunition were

in the glove compartment may be a legitimate consideration against

his PTI admission.

 In short, unlike the trial court, we are unable to conclude

on this record whether a full and fair consideration of defendant's

PTI application – which presupposes the absence of speculation or

consideration of inappropriate factors – will result in the denial

of defendant's admission into PTI. More importantly, when a

prosecutor has considered inappropriate factors, calling into

question whether defendant received full and fair consideration,

"[a] remand to the prosecutor affords an opportunity to apply the

 21 A-0611-15T3
standards set forth by the court without supplanting the

prosecutor's primacy in determining whether [Pretial Intervention]

is appropriate in individual cases." K.S., supra, 220 N.J. at 190

(alteration in original) (citation omitted).

 For the foregoing reasons, we reverse the trial court's order

admitting defendant into PTI. We remand this matter to the

prosecutor who shall afford defendant the opportunity to submit

current evidence in support of his PTI application. If defendant

is aggrieved by the prosecutor's decision, he may seek the relief

from the trial court provided by the applicable statute and court

rules. We intimate no views on the appropriate outcome which will

be based on an updated and fuller record and which must adhere to

the proper legal criteria as outlined in this opinion.

 Reverse and remanded. We do not retain jurisdiction.

 22 A-0611-15T3